[Civ. No. 2671.    Third Appellate District.—April 16, 1924.]

## HOWARD F. MUNDORFF, Appellant, v. PEARL E. RAMM, Administratrix, etc., Respondent.

[1] PROMISSORY NOTES — GUARANTY — MENTAL INCOMPETENCY — EVIDENCE—VERDICT.—In this action upon a promissory note, the payment of which had been guaranteed by defendant's intestate and others, in which action the mental incompetency of the deceased was pleaded as a defense, the evidence was sufficient to justify the implied finding of the jury that, at the time the deceased executed and so became a party to the obligation, he was mentally incompetent, due to prolonged and excessive use of intoxicating liquors; and the case was one which the appellate court was not at liberty to take from the jury, even if it be conceded that the testimony of the witnesses for the plaintiff who were present at the time of the execution of the guaranty might be regarded as substantially negativing the testimony introduced by the defendant.

---

1. Validity and effect of negotiable paper signed or indorsed by lunatic, note, 4 Ann. Cas. 539. See, also, 19 Cal. Jur. 835; 3 R. C. L. 1086.

[2] ID.—PRIOR AND SUBSEQUENT MENTAL INCAPACITY—EVIDENCE—AP-
PEAL.—Where the act of a party is challenged on the ground that,
at the time he performed or executed the act, he was insane or men-
tally unsound to such a degree that he could, at the time, have
no appreciation or rational understanding of the nature or quality
of his act, evidence is admissible as to his mental condition before
and after the act was performed for the purpose of showing
what his mental condition was at the precise time of doing the
act, and when there is, upon its face, substantial or credible evi-
dence that he was insane before and near the time of the doing
of the act and that such condition existed after the act, evidence
of those facts will, on review, be held sufficient to uphold the
verdict or finding of insanity, notwithstanding there may be evi-
dence tending to show that he was, at the time of performing
the act, sane and mentally capable of transacting business in his
usual or accustomed way.

[3] ID. — MENTAL INCAPACITY—PLEADING—RESCISSION.—In an action
upon a promissory note the payment of which was guaranteed by
defendant's intestate, the defendant, without first formally re-
scinding the contract, may interpose a defense as in avoidance
of the enforcement of the obligation against the estate of the
deceased on the ground that, at the time he signed the guaranty,
the deceased was without mental capacity to make a contract.

[4] ID.—ABSENCE OF SIGNATURE BY ANOTHER — EVIDENCE — INSTRUC-
TIONS.—In this action upon a promissory note the payment of
which had been guaranteed by defendant's intestate and others,
conceding there was not sufficient evidence to justify the
giving of an instruction addressed to the special defense based
upon the claim that the deceased signed the guaranty solely upon
the condition that a certain other person would also sign the
instrument, and that the latter did not do so, in view of the
vast amount of evidence supporting the defense of mental un-
soundness of the deceased, a miscarriage of justice did not
result from the giving of such instruction.

[5] ID.—UNDUE INFLUENCE—ISSUES—EVIDENCE—ERRONEOUS INSTRUC-
TION.—In such action, undue influence not having been made an
issue by the pleadings, and the only evidence of circumstances
at all tending to show undue influence not having been sufficiently
potent in probative power to justify a verdict predicated upon
that issue, the instruction upon the subject of undue influence
should not have been given; but, inasmuch as the instruction as
given involved nothing more than an abstract statement of the
rule applicable in cases in which an instrument in writing is

2.  See 10 Cal. Jur. 835; 14 Cal. Jur. 364; 14 R. C. L. 620.
4.  See 2 Cal. Jur. 1026; 2 R. C. L. 256.

sought to be set aside on the ground that the party making it
was unduly influenced to enter into the engagement evidenced
thereby, and in view of the fact that the principal reliance of the
defense was on the issue of mental incompetency, and of the
large amount of evidence presented in support of that issue,
the instruction was innocuous in its effect upon the rights of
the plaintiff, and the giving thereof did not produce a mis-
carriage of justice.

---

(1) 28 **C. J.**, p. 1033, sec. 203 (1926 Anno.).  (2) 32 **C. J.**, p. 761,
sec. 566.  (3) 28 **C. J.**, p. 1013, sec. 179 (1926 Anno.).  (4) 4 **C. J.**,
p. 1025, sec. 3009.  (5) 4 **C. J.**, p. 1035, sec. 3015.

APPEAL from a judgment of the Superior Court of
Fresno County.  C. E. Beaumont, Judge.  Affirmed.

The facts are stated in the opinion of the court.

M. F. McCormick and F. J. Heid, Jr., for Appellant.

George Cosgrave and Lindsay & Conley for Respondent.

HART, J.—This action was instituted by the plaintiff
against the defendants to recover on a promissory note, al-
leged to have been executed by the defendants in favor of
the plaintiff on the first day of September, 1920, for the sum
of $25,000, interest payable at the rate of six per cent per
annum.

The cause was tried before a jury by whom a verdict was
returned in favor of Pearl Ramm, etc., and judgment as to
her was entered accordingly.  The defendants Knox, Noroian
and Hagopian defaulted and judgment on their default was
entered against them for the full amount of the note sued
on.  A motion for a new trial as against the verdict in favor
of said Pearl Ramm, etc., was made and denied.  This ap-
peal is by the plaintiff from the judgment in favor of said
Ramm.

The note declared upon is set out in full in the complaint.
It provides for the payment thereof in installments as fol-
lows: $10,000 on or before the first day of January, 1921;
$7,500 on or before the first day of April, 1921, and $7,500
on or before the first day of September, 1921.  Said note
provides that interest on the principal shall be payable semi-
annually and that if default be made in any installment of

principal or interest, the whole amount of said principal and interest shall become immediately due and collectible.

The complaint alleges: "That at the time of the making, execution and delivery of the aforesaid promissory note, to-wit, on the first day of September, 1920, and as a part of the same transaction, and as the consideration and inducement upon which and for which the plaintiff delivered to said E. J. Knox the consideration for said promissory note, the defendants George Noroian and Albert D. Hagopian, together with Charles H. Ramm, made, subscribed and caused to be endorsed and delivered upon the back of said promissory note their written instrument of guaranty in words and figures as follows, to-wit: 'For value received, I hereby guarantee the payment of the within note and any renewal of the same, and hereby waive protest, demand and notice of nonpayment thereof.' '' (Signed by the last above-named defendants.)

It is alleged that there became due on the principal of said note on the first day of January, 1921, the sum of $10,000 and likewise there became due the sum of $7,500, "but that neither of said installments of principal has been paid and on March 1, 1921, the interest on the whole amount of principal of said promissory note became due; that no part of said installment of principal due and no part of said interest due has been paid, and pursuant to the terms of said promissory note plaintiff has and does hereby elect to declare the whole amount of principal and interest immediately due and collectible."

It is further alleged that Charles H. Ramm died intestate in the county of Fresno, on the eleventh day of January, 1921; that thereafter, and on the thirty-first day of January, 1921, the defendant Pearl E. Ramm, after due proceedings, was appointed administratrix of the estate of said deceased, and that, on the eighteenth day of February, 1921, she duly qualified as such administratrix; that, on the nineteenth day of March, 1921, plaintiff duly filed, in legal form, a claim against said estate founded on the note in suit. It is further alleged that ten days had elapsed since the date of the filing of said claim and that the said administratrix had taken no action thereon, neither rejecting nor allowing the same within ten days from and after the filing thereof, and that plaintiff, therefore, proceeds upon the presumption

that said administratrix has rejected said claim.   (Code Civ. Proc., sec. 1496.)

The answer, besides interposing formal denials to the averments of the complaint, sets up several defenses which are in the nature of pleas by way of confession and avoidance, viz.: 1. That Charles H. Ramm, at the time that he executed and so became a party to the obligation on which it is herein sought to hold and bind his estate, was mentally incompetent to transact business; 2. That the consideration inducing and moving said Charles H. Ramm to sign and execute the instrument of guaranty "has wholly failed," in that said Ramm executed said obligation wholly upon the condition that one W. S. Munger would, prior to the delivery to plaintiff of said note, execute the said instrument of guaranty jointly with him (said deceased); that "the makers of said note delivered the same to plaintiff, the payee named therein, with said instrument of guaranty endorsed thereon, without having first procured the execution of said instrument by said W. S. Munger; that plaintiff had knowledge of said condition upon which said Charles H. Ramm executed said instrument, prior to the delivery of the same to plaintiff; . . . that the maker of said note promised and agreed with said Charles H. Ramm that if said Charles H. Ramm would execute said instrument, the execution thereof by one W. S. Munger would be procured prior to the delivery thereof to plaintiff, and in the case of the failure of said Munger to execute the same, said note, with said instrument of guaranty endorsed thereon would not be delivered to plaintiff; that without said promise and agreement on the part of the maker of said note, said Charles H. Ramm would not have executed said instrument; . . . that, notwithstanding his said promise and agreement, said maker fraudulently and without right delivered said note to plaintiff, the payee named therein, with said instrument of guaranty endorsed thereon, without first having obtained the execution of said instrument by the said W. S. Munger."

A third special defense is set up, to wit: That the execution of the guaranty by Charles H. Ramm was by mistake "which mistake plaintiff knew at the time or suspected," etc.   This defense, however, is based upon the facts set out in support of the preceding special defense to the effect that Charles H. Ramm executed the guaranty solely upon the con-

dition that said Munger would join in the execution of the same obligation prior to the delivery of the note, with said guaranty indorsed thereon, to the plaintiff.

At the trial there was little reliance predicated upon the two last defenses referred to above. The defense of mental incompetency was principally relied upon in resistance to recovery upon the guaranty as against the estate of the deceased. At any rate, the evidence was mainly addressed to that issue, and thus we may assume that it was upon that issue that the verdict was planted.

The plaintiff contends that the verdict is not sufficiently supported by the evidence. It is also likewise claimed that the court erred in instructing the jury upon the question of failure of consideration for the alleged reason that there was no evidence introduced in support of the defense based upon that ground. Another instruction is assailed on the same ground. The contention is also made that there was no rescission of the contract, as required by section 1961, subdivision 2, Civil Code. The first point necessitates, of course, an examination herein of the evidence upon the issue of the alleged unsoundness of mind of the deceased, Charles H. Ramm, at the time he executed the obligation upon which this action is founded.

The note and guaranty in suit arose out of the following transactions: One E. J. Knox and the plaintiff, respectively maker and payee of said promissory note, were in the year 1919, and for some time thereafter, partners under the firm name and style of Knox-Mundorff Company and as such were engaged in the general automobile and auto supply business in the city of Fresno. The capital for the launching of this business (approximately $30,000) was obtained from one Ney Wolfskill. After the partnership of Knox and Mundorff was formed and the business for the carrying on of which it was formed was started, Wolfskill advanced the firm, as a loan, the sum of $20,000. In the month of August, 1920, Wolfskill brought an action to recover said $20,000 and to secure judgment for the same, at the same time causing an attachment to be levied upon the business and assets of the Knox-Mundorff Company. An indemnity bond was given by the company to the sheriff for the purpose of securing a release of the attachment lien. Judgment was secured by Wolfskill against the partnership for said

$20,000, but the same, for some reason not explained in the record, had not been satisfied at the time of the trial of this action.

About the time of the release of the firm property from the attachment lien, as above indicated, Mundorff and Knox by a written agreement, dissolved their partnership. The latter took over the entire business in consideration of the payment by him to Mundorff the sum of $30,000 in promissory notes—one, unsecured, for $5,000, and the other for the sum of $25,000, the note in suit.

At the time the note and the guaranty in suit were executed, the plaintiff was in the state of Colorado, and the transactions herein referred to were conducted by his attorney in fact, C. L. Russell, an attorney at law. The latter testified that on the day of the execution of the guaranty he went to the office of an attorney in Fresno, expecting to meet W. S. Munger and Albert Hagopian and there secure their guaranty of the payment of the note, it being provided in the contract between the plaintiff and Knox, so Russell said, that said Munger and Hagopian were to become guarantors of the payment of said obligation; that upon reaching said law office he saw the deceased and Noroian sitting in the waiting-room engaged in conversation. He had never seen the deceased before, but while he was still in the waiting-room he overheard the two men just named discussing the matter of executing an instrument guaranteeing the payment of the note in suit. Russell thereupon approached Hagopian and Ramm and asked them if they were there to execute a guaranty of said note. They replied that they were there for that purpose; that there were to be five signers to that note, to wit: Knox, W. S. Munger, Albert Hagopian, George Noroian and the deceased. Russell replied to them that he did not know before that all those parties were to join in the execution of the guaranty but said "that will be satisfactory to us, but we are not requiring anybody under our contract to sign this note but Albert Hagopian and Mr. Munger." Russell stated that Munger was not present and was told by Knox that he (Munger) had concluded not to join as one of the guarantors; that Ramm and Noroian insisted that they had other matters to attend to and that they would like to have their signatures taken to the guaranty so that they could give attention to said matters; that thereupon Ramm

and Noroian, in the presence of Knox, Ney Wolfskill, a Mr. Tupper, an attorney connected with the law office referred to, and the witness, signed the guaranty. Russell testified that he did not hear the deceased state that the condition upon which he proposed to and did sign the guaranty was that W. S. Munger was also to become a joint obligor thereon; that the deceased never at any time said to him or in his presence that he did not want the note, with the instrument of guaranty indorsed thereon, delivered to the payee named therein until said Munger had signed the guaranty. Russell admitted, however, that some ten or twelve days after the deceased, Noroian and Hagopian executed the guaranty, the following undated document was delivered to him by one of the attorneys at whose office the above transaction took place, said document having been procured at his (witness') request:

"We, Charles H. Ramm, Geo. Noroian and Albert Hagopian, the undersigned, do hereby state that we are the endorsers upon that certain promissory note in the sum of $25,000.00, dated September 1, 1920, signed by E. J. Knox as maker and payable to the order of Howard F. Mundorff.

"And we hereby jointly and severally state and represent that our said endorsements were in no manner contingent upon the representation or fact that Warren C. Munger would also endorse said note, and we further represent and state that the endorsement of each and all of us thereon is in all respects valid whether the said Warren C. Munger, or any other person, does or does not endorse the said note."

Asked how he came to request that the foregoing writing be executed and delivered, he explained that, as above stated, he did not understand that Noroian and the deceased or any persons other than Munger and Hagopian were to become guarantors, and that when he learned that Noroian and the deceased were to join in the execution of the instrument, and after they did do so, he concluded that he would be better satisfied to have the above writing as a matter of precaution.

The foregoing statement of Russell's testimony is given herein solely for the reason that, as will later appear, it has more or less bearing upon the point involving a challenge of the correctness of the action of the court in giving one of the instructions above referred to.

There was a large number of witnesses who testified upon the question of the mental condition of the deceased prior to and subsequent to the date of his execution of the guaranty. The larger number of these testified for the defense. A minute examination herein of their testimony will not be attempted. A general statement of the testimony, with occasional brief excerpts therefrom, will be sufficient.

Charles H. Ramm died on the twelfth day of January, 1921—a trifle over four months after the execution by him of the guaranty involved in this litigation. He died from the effects of prolonged and excessive use of intoxicating liquors and while in a state of delirium tremens, which itself indicates the abnormal use of such liquors for a long period of time. It was shown that he had for many years been a habitual user of intoxicants. A number of witnesses—intimate acquaintances—testified that, for a period of two years or more prior to his death, the deceased was constantly under the influence of liquor to an extent that rendered him irrational and wholly irresponsible. His conversations were incoherent, generally irrational, and, when near the border line of delirium tremens, which occurrences were for a long period in frightful contiguity, his declarations and statements were of a grandiose character. He had visions of the acquisition of colossal fortunes, sometimes in the form of a gold mine buried beneath his vineyard, which was without foundation, there not being the slightest evidence of mineral deposits of any character in said land. He declared to his friends that he proposed to purchase an aeroplane and made other equally as extravagant statements having absolutely no foundation for their support. He on one occasion spoke to an acquaintance about erecting an apartment house involving a large expenditure of money, but within a few days thereafter, on being asked by said acquaintance when he intended to start work on the structure, replied, in effect, that he had never thought of erecting such a building and had never told said acquaintance or any other person that he had in view or contemplated the erection of an apartment house. He was in the habit of telling acquaintances, with apparent seriousness, that he had made investments involving the expenditure of thousands of dollars, when the truth was that he had made no such investments. When in a state bordering upon delirium tremens he had the wildest

66 Cal. App.— 36

visions of unreal happenings, things and persons. He claimed to have seen spirits of the dead and that some had actually ridden with him in his automobile, and, as is characteristic of the delirium tremens, he insisted that he had been in the company of and pursued by demons of the most horrible description.

Mrs. Ramm testified that during nearly the whole of the period of their married life he was an incessant drinker of intoxicants; that he was in a state of drunkenness much of that period; that he got so he would drink any kind of liquor, or, if he could not get liquor at some particular time, he would drink any other stimulant of which he could get possession; that on one occasion, when he had no wine or other liquors at home, he drank a quantity of vinegar. She further testified that he always carried liquor in his automobile, and that in September, 1920, had 500 gallons of wine delivered to him at his home. "He would go out in the morning," she said, "and bring this pitcher in the house practically full, and he would take it in the library, and set it on the library table, with a glass or a cup, and he would drink it during the day, and it would be empty in the evening. In the evening he would go to the garage again and have it filled, bring it in the house and drink it during the night. The next morning the pitcher would be empty and, of course, would be filled the same way." She stated that the pitcher he used in bringing the wine to his house would hold a gallon and a half. She further testified that "toward the end of the year (1920) he still continued drinking that wine in the way I said, and he would bring it in in the morning and he would be in a paralyzed condition during the whole day." She stated that in the year 1920, and particularly in the fall of that year, he told her in the most serious manner about big deals he had made and from which he insisted he had realized large profits, whereas, the truth was, she said, no such deals had been made by him, or, for that matter, no business deals of any kind or character had been made by him at the times referred to. "He would have different visions of things and always seeing horrible things," Mrs. Ramm continued. "He would see people all cut to pieces, see four-legged human beings and see animals with human heads and all kinds of things." She declared that he squandered his money so recklessly that she

was compelled to take charge of his affairs so as to protect herself and child. Mrs. Ramm related many other instances, all occurring within a brief time of each other, in which her husband exhibited like evidences of a seriously disordered mind. She stated that he suffered from such hallucinations as are above described both prior and subsequent to the first day of September, 1920, and down to the date of his death.

The other witnesses for the defense—some fourteen in number—described Ramm's mental condition in substantially the same way as it was described by Mrs. Ramm. One witness testified that he would drink anything in the nature of intoxicants that he could get hold of—whisky, wine, brandy and even jackass brandy and straight alcohol. Nearly all of the witnesses, having known him well for a considerable period of time and seen and talked with him on many occasions in the year 1920, declared that it was their opinion that during said year his mental condition was such that he was mentally incompetent to transact any kind of business. In fact, one of the witnesses stated that some of the time he thought that the deceased had no such thing as a mind, although there were times when he seemed to be in pretty good condition. The witness said, however, that the deceased kept growing worse all the time. The foregoing statement comprehends a brief *résumé* of the testimony of the lay witnesses, although it should be said that these witnesses in describing the mental condition of the deceased gave detailed instances of evidence of mental aberration and gave a full explanation of the reasons which they thought justified them in expressing the opinion that the deceased was mentally unsound to the extent that he was without volition or intelligence sufficient to carry on a business transaction properly.

Dr. Clarence J. Tillotson, a practicing physician for thirty-one years, knew the deceased and was his family physician. He knew him prior to and in the spring of the year 1920, when the deceased left Dinuba in Tulare County and went to Fresno County. He testified that he saw him two or three times a week and rendered him professional services during that time. After the deceased left Dinuba and down to the time of his death the doctor saw him two or three times a month. The doctor testified: ''My relation with Charley Ramm was one of particular friendship. In

the year 1918 I left Dinuba for one year. I was in the service. I came back in 1919. Up until that time I had known that he drank considerably, but after that time, after my return, his mental condition was very badly deranged. He was in a state of alcoholic paresis. He was disconnected in his reasoning and in his talk and he was unable to give a connected story of anything. He also had a great many visions and hallucinations about making money very easily. . . . He was unsteady, at times his tongue was thick and his ideas were mixed and confused. In my judgment he was not competent to handle business affairs after the beginning of 1920. I came home in 1919, and from that time on, in my opinion, he was not competent to do business. Throughout the year 1920 his condition did not improve. I saw him about a week before he died and at that time his condition was very much worse than it had been any time. The most of any business transactions that he was engaged in that he discussed with me was that he wanted I should buy some stock in various concerns that he was interested in; he had a story about a gold mine; I never paid very much attention to these stories, but it seemed that he had it in his mind that all he had to do was to go out on certain portions of some of the ranches and he could dig all the gold they needed. He told me this. That was just before he came up here (referring to Fresno)." The doctor described alcoholic paresis as "a gradual dissolution of the mental faculties by long continued use of alcoholics. Some of the symptoms of paresis in relation to large wealth or expectations of wealth are that usually those people have a great imagination as to accumulating wealth with very little effort."

The defense introduced no direct testimony as to the mental condition of the deceased on the day upon which he joined in the execution of the guaranty in suit. There was, though, the testimony of several gentlemen who were present when that transaction took place. They testified for the plaintiff that the deceased appeared to understand what he was doing and so far as they were able to observe showed no signs of such deficiency in his mentality as would justify the conclusion that he was not capable of understanding the business he was then attending to. It was further shown that the deceased, through a real estate agent, sold his farm for $120,000 in September, 1920, and that deceased and his

wife executed the papers negotiating the sale and a conveyance of the property; but Mrs. Ramm attended him and was present on all occasions when that transaction was under negotiation and finally consummated and took active part therein.    [1]    But it is clear that the case, as made, is one which this court is not at liberty to take from the jury, even if it be conceded that the testimony of the witnesses for the plaintiff who were present at the time of the execution of the guaranty may. properly be regarded as substantially negativing the testimony introduced by the defendant. Upon the issue of unsoundness of mind, the most that can be said of the situation as presented here is that there exists thereon a substantial conflict in the evidence.

Although the illusions, delusions and hallucinations of the deceased, as indicated above, are the characteristics or the result of a mental malady (delirium tremens) which, when taken in time and religiously attended to, is subject to the curative power of appropriate therapeutic treatment, yet, when such occurrences have become common and cover a long period of time, all due to the inordinate prolonged use of intoxicants, they will afford well-nigh unimpeachable, if not conclusive, evidence of substantial impairment of the mentality, or, indeed, of insanity.    But it is not necessary to look further than to the uncontradicted testimony of Dr. Tillotson for sufficient justification for the conclusion which it is to be assumed the jury arrived at, to wit: That, at the time of the execution of the transaction in question, the deceased was menally incompetent.    Paresis, with which the doctor testified that the deceased was afflicted, is the destruction of the brain cells, and, as that witness declared, is progressive.    This testimony is itself sufficient to support the verdict.    But when considered in connection with the other testimony in the case tending strongly to show that the deceased was for a long period of time mentally unbalanced, from the excessive use of intoxicating liquors, it is manifest that a very strong case of mental incapacity was made out.

[2]    The rule uniformly laid down in the cases in which an act of a party is challenged on the ground that, at the time he performed or executed the act, he was insane or mentally unsound to such a degree that he could, at the time, have had no appreciation or rational understanding of

the nature or quality of his act, is that evidence is admissible as to his mental condition before and after the act was performed for the purpose of showing what his mental condition was at the precise time of doing the act, and that when there is, upon its face, substantial or credible evidence that he was insane before and near the time of the doing of the act and that such condition existed after the act, evidence of those facts will, on review, be held sufficient to uphold a verdict or finding of insanity, notwithstanding that there may be evidence tending to show that he was, at the time of performing the act, sane and mentally capable of transacting business in his usual or accustomed way. Some of the cases laying down and applying the rule thus stated are: *Estate of Tibbetts,* 137 Cal. 123 [69 Pac. 978]; *Estate of Huston,* 163 Cal. 166, 169, 171 [124 Pac. 852]; *Estate of Jones,* 166 Cal. 108 [135 Pac. 288]; *Estate of Martin,* 170 Cal. 657 [151 Pac. 138]; *Estate of O'Connor,* 51 Cal. App. 339 [196 Pac. 792.]

In *Estate of Jones* one of the grounds of contest of the will of the deceased was that he was insane at the time of the making thereof. It appeared that ''at the very time of making the will, the persons present were those who, it is claimed, exercised the undue influence. They all, without exception, testified that the testator was then of sound and disposing mind. There was no direct evidence to the contrary as to his condition at that time. It is argued that for this reason the verdict on this issue is contrary to the evidence.'' The court held against that contention upon the proposition that the evidence of the insanity of the deceased before and subsequent to the date of the execution of his will was sufficient to uphold the verdict.

In *Estate of Martin* it is said: ''Direct and uncontradicted testimony that at the time of the execution of his will the testator was of sound and disposing mind is not conclusive upon the question of his then mental condition,'' there being, as here, as also in the case of *Estate of Wilson, supra,* evidence of the unsoundness of mind of the party whose act was assailed on the ground of mental incompetency before and after the performance of the act.

[3] The contention that ''no defense was established because neither Ramm nor his administratrix rescinded the obligation,'' is devoid of merit. Counsel cites section 39 of

the Civil Code as authority for the contention. That section merely provides that the contract of any ''person of unsound mind, but not entirely without understanding, made before his incapacity has been judicially determined, is subject to rescission, as provided in the chapter on rescission of this code.'' But said section does not provide, nor is it subject to such a construction, that the defense of unsoundness of mind may not be set up as in avoidance of a contract or the effect thereof without a previous rescission of the same. The defendant is not seeking affirmative relief. There is no ground here for asking such relief. She is not asking that anything be returned to her. The act of her husband in signing the guaranty was purely one of accommodation. He received nothing of value as a consideration for that act. There was, therefore, nothing for him or his administratrix to return to the plaintiff as a prerequisite to the right to a rescission. (Sec. 1961, subd. 2, Civ. Code.) She has merely interposed a defense as in avoidance of the enforcement of the obligation against the estate of the deceased on the ground that he was, at the time he signed the guaranty, without mental capacity to make a contract. This course she had the legal right to take under the circumstances of the situation presented here without first formally rescinding the contract. (Pomeroy, Equity Jur., 2d ed., sec. 872; *Toby* v. *O. P. R. R. Co.*, 98 Cal. 490, 498 [33 Pac. 550]; *Field* v. *Austin*, 131 Cal. 379 [63 Pac. 692]; *Simon Newman Co.* v. *Lassing*, 141 Cal. 174, 178 [74 Pac. 761]; *California Reclamation Co.* v. *New Zealand Ins. Co.*, 23 Cal. App. 611 [38 Pac. 960]; *Dunlap* v. *Plummer*, 1 Cal. App. 426 [82 Pac. 445].)

[4] The given instruction addressed to the special defense based upon the claim that deceased signed the guaranty solely upon the condition that W. S. Munger would also sign the instrument was not entirely without pertinency, although, in view of the ample showing made upon the defense of mental incompetency, there was no real necessity for giving it to the jury. The testimony of Russell, plaintiff's agent in the transaction, disclosed several facts which were not lacking in significance in connection with the defendant's claim as indicated by said defense, viz.: 1. That the contract between Knox and plaintiff as to the making of the note provided that the same should be indorsed by

Hagopian and Munger; 2. That Russell had never heard of deceased in connection with the transaction, and, in fact, had never seen him until the day the guaranty was signed; 3. That when the deceased informed Russell that he intended to sign the guaranty, either he (deceased) or Noroian stated at that time that five persons were to sign the guaranty (three besides the deceased and Noroian) and named Munger as one of the five; 4. That, some ten days after the guaranty was signed by the deceased, Russell procured the written document signed by Ramm and the other guarantors, stating, among other things, that they did not sign the guaranty on the condition that Munger would sign it before the note, with the guaranty, was delivered to plaintiff; that Russell testified that this document was desired by him as a "matter of precaution." We are not prepared to say that those facts would be sufficient to support a verdict in favor of the defendant on that issue; nor are we willing now to say that, taken with certain other circumstances, slight in character, it is true, but apparently corroborative thereof, those facts would not support a verdict upon said defense for the defendant. But, in any event, if it should be conceded that there was not sufficient evidence to justify the submission of the instruction to the jury, it is clear that, in view of the vast amount of evidence supporting the defense of mental unsoundness of the deceased, a miscarriage of justice has not and will not result from the giving of the instruction under present consideration.

[5] The instruction upon the subject of undue influence should not have been given. There was no such issue made by the pleadings. It is true that the testimony, rather incidentally than through any purposed attempt to make undue influence an issue, revealed a few circumstances which might well generate a suspicion that undue pressure to some extent was brought to bear upon the deceased, while under the influence of liquor, to induce him to sign the instrument, but they were not sufficiently potent in probative power to justify a verdict predicated upon that issue. The instruction, however, involves nothing more than an abstract statement of the rule applicable in cases in which an instrument in writing is sought to be set aside on the ground that the party making it was unduly influenced to enter into the engagement evidenced thereby. The language of the instruc-

tion does not assume that there existed in the case any evidence tending to establish that deceased was unduly influenced to sign the guaranty. We think that, in view of the fact that the principal reliance of the defense was on the issue of mental incompetency and of the large amount of evidence presented in support of that issue, the instruction was innocuous in its effect upon the rights of the plaintiff. (See *Bosqui* v. *Sutro R. R. Co.*, 131 Cal. 390, 401 [63 Pac. 682].) Indeed, it would be an uncomplimentary commentary upon the intelligence of the jury to hold that the instruction influenced them in the consideration of their verdict, when it must have been obvious to them that the only substantial testimony in the case tending to support the case of the defendant was that which was addressed to the issue of mental incompetency. At any rate, considering the record as a whole, we would not be justified in holding that a miscarriage of justice was produced by the giving of the instruction.

The contention that the court erred in denying plaintiff's motion for a directed verdict is fully answered by the above consideration of the evidence and the conclusion therefrom following that the verdict is amply supported, evidentially.

We have examined with care the rulings upon questions of the admissibility of certain evidence of which the plaintiff here complains, and thus have been carried to the conclusion that, while one or two of the assignments thus advanced against the legal integrity of the verdict may, in strictness, be subject to criticism, they are not of sufficient force to justify a reversal.

The judgment is affirmed.

Plummer, J., and Finch, P. J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 14, 1924.