George L. **KNOTT**, Assignee of Alpha Machine & Foundry, Plaintiff,

v.

Prescott C. **PERVERE** et al., Defendants.

Civ. A. No. 66-629.

United States District Court
D. Massachusetts.

June 3, 1968.

Marshall L. Tutun, Slater & Goldman, Boston, Mass., for plaintiff.

Philip M. Cronin, Withington, Cross, Park & Groden, Boston, Mass., for Prescott C. Pervere.

James P. Lynch Jr., Nutter, Mc-Clennen & Fish, Boston, Mass., for Everett W. Pervere and Charles B. Newhall.

## OPINION

CAFFREY, District Judge.

This is a civil action in the nature of a bill in equity removed to this court from Suffolk Superior Court, Commonwealth of Massachusetts. Plaintiff, a resident of Palo Alto, California, is Assignee for the benefit of creditors of Alpha Machine & Foundry, a California corporation (hereafter Alpha). The defendant Prescott C. Pervere is an individual alleged in the complaint to be of parts unknown, and also alleged to be the donor and principal beneficiary under the Prescott C. Pervere Indenture of Trust dated July 15, 1953. The defendant Everett W. Pervere was a resident of North Andover, Massachusetts. He died on January 4, 1968, between the removal and the trial of this case. The defendant Charles B. Newhall is a resident of Massachusetts and a trustee under the Prescott C. Pervere Indenture of Trust.

The complaint alleges that on March 4, 1965, defendant Prescott C. Pervere (hereafter Pervere), and others not party to this action, entered into a written agreement to incorporate Alpha and to subscribe for its stock; that Pervere subscribed for 6,000 shares of $10 par value common stock of Alpha and agreed to pay Alpha $60,000 therefor; that thereafter he received 2,420 shares of Alpha stock and paid Alpha $24,203.99 on account of his subscription agreement; and that on June 16, 1965, the Board of Directors of Alpha served a call on Pervere, by registered mail, for payment of the balance due, despite which he has failed and refused to pay the balance due of $35,796.01.

It is also alleged that Alpha has performed all the terms, conditions and covenants to be performed by it under the terms of the pre-incorporation agreement and that it is presently insolvent. It is further alleged that on July 15, 1953, Pervere transferred certain valuable assets to the trustees of the Trust. Plaintiff seeks to enjoin the trustees from disposing of these assets and to reach and apply Pervere's interest therein in the amount found to be due from him to Alpha.

Defendant's answer raises, as matter of affirmative defense, the claim that he

lacked mental capacity to enter into the agreement on March 4, 1965, partial payment, and illegality of the pre-incorporation agreement of March 4, 1965 under Section 25153 of the California Corporation Code. The answer also contains a counterclaim for the $24,203.99 paid by Pervere to Alpha.

After trial I find and rule as follows: There is complete diversity between the parties since at the time suit was brought defendant Pervere was a resident of Miami, Florida, the other two defendants were residents of Massachusetts, and the plaintiff was a resident of California.

Pervere is now 49 years of age. He graduated from Harvard in 1941 and after service with the Merchant Marine in World War II migrated to California where he became engaged with his then father-in-law in the coin-operated laundry business. In 1951 he formed his own coin-operated laundry business under the name Pacific Meter Corporation. During the period from about 1950 to 1960 he was represented by Attorney Lawrence F. Keuchler. In July 1953, Pervere transferred to the trustees under the Prescott C. Pervere Trust assets stipulated to be of a fair market value in excess of $245,000. Pacific Meter Corporation was an apparently financially successful venture, from which Pervere withdrew $88,500 between April 1958 and June 1965. However, he did not pay any federal income tax on these withdrawals, which were reported to the Internal Revenue Service by the purchasers of Pacific Meter Corporation (it was sold by Pervere in July 1965). The Internal Revenue Service has made a determination that these withdrawals were taxable income to Pervere with a potential tax liability of approximately $49,000.

Pervere was divorced from his first wife in about 1960, and married his second wife, Olive, on November 11, 1964.

In the early sixties Pervere invested in a company called Technology Development Corporation (hereafter TDC) which was a machine shop business. It became clear by the fall of 1964 that the financial collapse of TDC was inevitable. Concern lest his potential liability from the demise of TDC would cause him to lose his equity in Pacific Meter Corporation, he consulted Attorney William E. Anderson, Jr., of Palo Alto, California, in January 1965. Pervere attended a meeting on February 1, 1965, at TDC, at which were present Attorney Anderson, Olive Pervere, and Julius Bertrand, who was "more or less head of TDC." At the meeting Bertrand was told that Pervere would not invest any more in TDC although Bertrand wanted to be paid $40,000 for the time he had been associated with the company. At this meeting, Pervere became irritated, started shouting at Bertrand, was sent out of the room to an outer office, where he continued "screaming or bellowing" until he was directed to go outside and wait in the automobile until the meeting was concluded between Anderson, Bertrand and Mrs. Pervere.

On February 16, 1965, Attorney Anderson arranged a conference between Pervere and one John J. Hankard, one of the principals in TDC. Thereafter Hankard conferred with Charles A. Clifford and Wayne Loe who had formerly been associated with him in a business entity called Alpha Machine & Foundry Company. These three made up and submitted to Anderson a list of the equipment they believed would be necessary to launch a new venture to be called Alpha Machine & Foundry (as distinguished from the former Alpha Machine & Foundry Company). In late February 1965, Pervere, Hankard, Clifford, Loe, and Thomas Rieger, an accountant, met at Anderson's office to discuss prospects for the contemplated Alpha. Hankard observed that at the end of this meeting Pervere was drinking so heavily that he could not sit at the table to have lunch and was sent outside to the car to sleep it off. Another meeting was held on March 2, 1965, between Pervere, Hankard, Clifford, Loe, Rieger, and Attorney Anderson, at which it was decided to form Alpha.

Pervere and his second wife Olive (also known as "Pip") normally had a steady flow of conversation until about March 1, 1965, at which time, according to her deposition testimony, he became very antagonistic and non-communicative. On March 4, 1965, he arose at 5:00 a. m., showered and dressed, and when asked by Olive where he was going he just looked at her and walked out. She next saw him around 5:00 p. m. that day. The pre-incorporation agreement was executed at Attorney Anderson's office that very morning, at a meeting attended by Pervere, Hankard, Clifford, Loe, Rieger and Anderson. The Board of Directors of Alpha organized at a meeting on March 5, at which Pervere was not present. The officers elected were: Hankard, President; Loe, Vice-president; Rieger, Secretary; and Clifford, Treasurer. The Directors were Hankard, Rieger, Clifford, and Anderson. Meetings of the directors were held on March 10, April 2, and June 16, 1965. A permit authorizing the sale of 4,500 shares of stock of Alpha to Pervere was issued by the Commissioner of Corporations of California on April 23, 1965. Paragraph 2 of the pre-incorporation agreement executed on March 4, 1965, provided that Pervere would subscribe to 6,000 shares at $10 per share, payable "$15,000 in the form of a loan if said funds are required before the issuance of a permit and the balance over a six-month period." Paragraph 11 of the agreement provided that the issuance of shares was "subject to a permit from the Commissioner of Corporations." Between March 5 and April 23, 1965, the date the permit was issued, Pervere made the following payments to Alpha:

| | |
|---|---|
| March 5 | $3,000.00 |
| March 11 | 1,321.85 |
| March 15 | 4,892.14 |
| March 25 | 1,000.00 |
| March 30 | 9,990.00 |

and after the issuance of the permit he paid $2,000 to Alpha on May 2 and $2,000 on June 5, 1965. None of these payments was entered on the corporate books under a loan account but all, even those made prior to the issuance of the permit, were recorded as "contributed capital." Pervere received no income from Alpha, Clifford received $200.00 a week from March 5 to June 26, Loe received $3,400 over the same period, and Hankard received $4,000 during this time. Demand for payment of $35,796.-01 was made on Pervere, pursuant to the vote of the directors, on June 16, 1965. Pervere refused to pay the $35,796.01 and, in fact, through his counterclaim seeks to recapture the $24,203.99 which he did pay.

■ These issues may be resolved in terms of Pervere's mental capacity to enter into a valid contract. It is clear that under the conflict of law principles applied in the courts of the Commonwealth of Massachusetts, the law of California would be selected as the law which sets the standards for determining Pervere's capacity to contract, Richards v. Richards, 270 Mass. 113, 169 N.E. 891 (1930); Adamowski v. Curtiss-Wright Flying Service, Inc., 300 Mass. 281, 15 N.E.2d 467 (1938); Restatement, Conflict of Laws, Sec. 333, and it is equally clear that in a diversity case this court must follow the Massachusetts law on conflict of law, Klaxon Co. v. Stentor Electric Mfg. Co., 313 U. S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

In Drum v. Bummer, 77 Cal.App.2d 453, 175 P.2d 879, the California court stated the test to be used in determining the capacity of a person to enter into a valid agreement of the type in issue, observing (at p. 883):

"Plaintiff has not been adjudged incompetent and, it appears, he was not entirely without understanding. In such a case the test to be applied is whether the party was mentally competent to deal with the subject before him with a full understanding of his rights—whether he actually understood the nature, purpose and effect of what he did."

See also Peterson v. Ellebrecht, 205 Cal.App.2d 718, 23 Cal.Rptr. 349; Carr

v. Sacramento Clay Products Co., 35 Cal.App. 439, 170 P. 446.

■ Under California law evidence of a person's actions before and after the date of execution of a contract is admissible in determining that person's mental condition on the date the contract was executed. Mundorff v. Ramm, 66 Cal.App. 553, 226 P. 820.

I find on the basis, *inter alia*, of the report of the Ross General Hospital, Ross, California, that Pervere has suffered manic depressive episodes since he was twenty years of age, that he was first hospitalized in 1949 because of manic-elated, flighty behavior, that he recovered from that episode and was later hospitalized in 1957 and in 1959, receiving electro-convulsive treatments during his 1959 hospitalization. He was admitted to the Children's Hospital, San Francisco, on March 27, 1961, with vomiting, question of drug intoxication, and acute lumbar strain. The hospital records indicates that he had been hospitalized at St. Francis Hospital in 1959 with diagnosis of hypomania, that he was subject to periods of depression, that he had been a heavy alcohol drinker for 25 years, and that on admission he stated he had been drinking at least a quart of alcohol a day. This record also contains the notation "reliability highly questionable."

Pervere entered the San Rafael General Hospital, San Rafael, California, on May 18, 1962. The admitting physician's note states: "The patient has been under my care for a manic-depressive state, has been depressed for the last nine months approximately, although it is not a severe depression but moderate in degree." The discharge diagnosis, made June 4, 1962, was "acute brain syndrome." Nine days later, on June 13, he was admitted to Ross General Hospital. The record discloses a history to the effect that he had had manic-depressive episodes for about 15 years, plus. The diagnosis made during this hospitalization was (1) manic-depressive, manic type, (2) alcoholism, acute, chronic, (3) chronic and acute brain syndrome. He was discharged from Ross General on July 1, 1962.

Pervere was again admitted to Ross General on May 8, 1963, for "manic state, moderate," and was discharged five days later, on May 13. Nine days later, on May 22, he was again admitted to Ross General. The hospital record states, "Patient has a manic-depressive psychosis with a manic state superimposed on high alcoholic intake. He developed delirium tremens on May 26 with visual hallucinations and confusions." He was discharged on June 3, 1963, with a diagnosis of (1) acute brain syndrome, (2) manic state. He re-entered Ross General nine days later, on June 12. The history of this hospitalization discloses that one or two days after his prior discharge he began drinking heavily and in increasing amounts, and became over-active, grandiose, and irritable. The discharge diagnosis made on June 17, 1963, was "manic-depressive, manic type."

On January 5, 1964, Pervere was once again admitted to Ross General Hospital, with a diagnosis of (1) manic-depressive reaction, recurrent manic phase; (2) alcoholic intoxication, acute and chronic. The history taken at his admission indicated he had been high since October 1963 and that in the past few months he had been over-active, using excessive alcohol, between one-half to one-fifth of vodka a day, and had been very over-active in the possibility of grandiose business plans. He was discharged from this hospitalization on January 14, with a discharge diagnosis of (1) manic depressive, manic type, moderate, (2) alcoholism, acute, (3) sprained right ankle.

On December 7, 1964, Pervere was taken by ambulance to Children's Hospital, San Francisco. The admitting history indicated that he had been suffering severe vertigo for ten days, lethargy for eighteen days, complained of head pain, and was confused and disoriented. He was discharged on December 9, with a diagnosis of cerebral concussion, acute alcoholism.

In addition to the above series of hospitalizations, the record establishes that various friends, business associates, and relatives of Pervere observed that he did not appear or act normally over many years. These persons, none of whom has a financial stake in the outcome of this case, include Seneca B. Anderson, Pervere's brother-in-law, a Harvard Law School graduate presently practicing law as a senior partner in the firm of Shutts and Bowen, Miami, Florida. He testified on deposition that he observed unusual and abnormal behavior on the part of Pervere from 1949 through February of 1965; that in this period of 1965 he appeared very depressed, was drinking heavily, to the point of getting quite sick and getting quite drunk. He testified that he also observed Pervere in June of 1965, at which time he was completely depressed, his statements were not logical, and he was more or less rambling in his speech.

Pervere's sister, Martha Pervere Anderson, testified on deposition that in 1964 she observed a noticeable change in his mental condition since the time she had last seen him, approximately four years earlier. She testified that when he spent ten days visiting her home in early February of 1965 he was drinking to excess and that when he visited her again in June of 1965 he was "terribly depressed," drinking to excess, and his speech was totally incoherent.

Lawrence F. Keuchler, a member of the San Francisco law firm of Pillsbury, Madison & Sutro, who has been a member of the bar of California since 1938, was attorney for Pervere in connection with the formation of Pacific Meter Corporation, and other business matters, until about 1960. Mr. Keuchler testified on deposition that on the basis of his observations of Pervere, he persuaded him to sign himself into St. Francis Memorial Hospital, San Francisco, in 1957, as being mentally incompetent. Mr. Keuchler's observations included the fact that Pervere's conversation was completely irrational and his remarks about other people were, to Mr. Keuchler's own knowledge, ridiculously false. He also testified that while he was representing Pervere, Pervere was always extravagant and that he entered into several business transactions which he did not have the financial ability to complete and from which Keuchler was able to extract him without serious financial repercussions. These transactions included buying an un-needed new car on one occasion and purchasing a parking lot in Sacramento on another occasion.

Stanley W. Cordy, an employee of Pacific Meter Corporation, testified on deposition that he has known Pervere since 1946, and saw him about four times a year during the period 1960 through 1965. He testified that Pervere in that period called him on the telephone at 3:00 or 4:00 a. m. for no apparent reason, and also traveled 50 miles to Cordy's home at 3:30 a. m. for no apparent reason other than a conversation which made no sense. He testified that Pervere's speech was terribly incoherent at times during the period 1963 to 1965. Cordy left Pacific Meter because Pervere was drinking very heavily and he could not correspond with Pervere at that time.

Various other examples of abnormal behavior by Pervere were testified to on deposition, by Edward H. Pearson, a San Francisco advertising salesman who met Pervere in 1963; by Mrs. Linda Pearman, an employee of a San Francisco research company, who met Pervere in 1964; Warren Outten, an assistant project manager for a San Francisco construction company, who met Pervere in 1958; and Harry H. Bassett, Chairman of the Board of the First National Bank of Miami, Florida, who was contacted by Pervere in 1964.

The effect of this deposition testimony is to establish that Pervere's conduct was consistently abnormal for several years prior to 1965, so abnormal as to be obvious to any lay witness.

I do not believe the testimony of Charles A. Clifford at the trial, or the deposition testimony of the other parties to the pre-incorporation agreement to

the effect that they did not notice anything abnormal about Pervere's behavior. It should be noted incidentally that Pervere was billed, and he paid, the exorbitant sum of $14,737 for legal services allegedly rendered to him by William E. Anderson, Jr., in the period of January to June 1965. This expensive legal advice seems to have produced two highly undesirable results for Pervere, (1) his involvement in the instant litigation, and (2) his loss of his equity in TDC.

In addition to the litany of hospitalizations for manic-depressive condition, acute alcoholism, and other mental disabilities, the thrust of the deposition testimony herein indicates that for a number of years prior to and for a lesser period subsequent to March 4, 1965, Pervere when in the high or manic state was constantly talking about or attempting to enter into a variety of highly fanciful, impractical, grandiose schemes or transactions, all of which were beyond his then financial means. His conduct was often bizarre, including such things as seeking a $500,000 loan from Harry H. Bassett while refusing to disclose the purpose thereof, and seeking something between $60,000 and $200,000 from Seneca B. Anderson, again refusing to disclose the reason therefor. In the area of his personal life his conduct was equally bizarre. He proposed marriage to Outten's sister-in-law, who was married at the time, and three days before his marriage to Olive Pervere he solicited advice from his sister and others as to which of three girls then under his consideration he should marry.

There is plentiful evidence that over the years he was an excessively heavy drinker and there is evidence that unlike many persons with mental disability he himself, at least at times, was aware of his limitation, since he instructed his second wife shortly after their marriage to read any and all papers submitted to him for his signature. This instruction should be contrasted with his furtive conduct sneaking out of the house at 5:00 a. m. on the day he executed the pre-incorporation agreement.

The deposition testimony of Dr. Samuel T. D. Anderson casts further light on Pervere's lack of mental capacity. Dr. Anderson, a practicing psychiatrist of San Rafael, California, testified that he has seen Pervere on over two hundred recorded visits between June 25, 1961 and July 7, 1965, and that he also had numerous unrecorded telephone conversations with him. He testified that among the recorded visits to him by Pervere were those of January 19, 1965, February 11, 1965, and May 30 and 31, 1965, and eleven visits on various dates in June 1965. He testified that Pervere was his patient and under his care on March 4, 1965 and that it was his opinion that on March 4, 1965 Pervere was unable to transact business because he was in a manic state at that time. In accepting this opinion of Dr. Anderson, which I do, I have in mind that he saw Pervere 79 times in 1962, 33 times in 1963, 10 times in 1964, and 16 times in 1965, over and above the uncounted telephone conversations he had with him.

I find that Pervere has sustained his burden of proving the issue raised by his affirmative defense, namely, that on March 4, 1965 he did not actually understand the nature, purpose and effect of what he did, and I rule that he was not mentally competent to deal with the subject matter before him with a full understanding of his rights, and that he was legally incapable of transacting business on that day.

In making this ruling I have in mind, in addition to the facts found above, the additional facts that Dr. Ronald A. Shellow, a Florida psychiatrist, who testified on deposition, was of the opinion, on the basis of his examination of Pervere made on July 26, 1966, that Pervere was suffering then from a manic-depressive reaction which involved recurring intermittent episodes of either manic or depressed behavior, or both, and that this condition extended back to 1949. Dr. Shellow made a determination on that date that Pervere was then unable to even handle benefit payments from the Social Security Administration and that

he was unable to handle his own business affairs.

■ Another consideration, which under California law is relevant on the issue of mental capacity, Stratton v. Grant, 139 Cal.App.2d 814, 294 P.2d 500, is whether the transaction was foolish or irrational from the point of view of the person whose capacity is in question. The contract made by the five parties to the Alpha pre-incorporation subscription agreement was, from the point of view of Pervere, a classic example of a "heads I lose, tails you win" type of arrangement. None of the parties thereto save Pervere invested any cash in this venture. Pervere took the entire risk of cash loss, in the amount of $60,000. Each of the other four was awarded 1,000 shares of the common stock of Alpha for past and future services to Alpha. There is no evidence to substantiate that these services in fact had the value of $10,000, as recited in the pre-incorporation agreement. In addition, Clifford and Loe acquired another 1,000 shares each for the assets of their defunct partnership, which were valued at $20,000 in the agreement, again without any audited basis for this value. The contract provided, in effect, that if Alpha proved financially unsuccessful, which it did, Pervere would sustain the loss of $60,000 cash which he was obligated to invest therein. However, the contract also provided that if the venture turned out to be financially successful, Pervere's four associates could divest him of up to 3,800 shares of the common stock of Alpha and they could do so with no gain whatsoever to him if they exercised their option to do so during the first eighteen months after incorporation. The agreement further provided that if they exercised their option during the second eighteen months, all Pervere would get as a return on the capital he had invested were premiums ranging from five cents per share to ninety cents per share. In addition, the subscription agreement contemplated that the other four parties thereto would be salaried employees, whereas Pervere would be uncompensated, and the other four parties in fact did receive the compensation recited earlier in this opinion.

Although under some circumstances the retention of counsel would be relevant on the question of Pervere's mental capacity, Philbrook v. Howard, 157 Cal. App.2d 210, 320 P.2d 609 (1958), I give it no weight whatsoever in the instant case because of the apparently divided loyalties of Attorney Anderson in this case. He served as counsel for Alpha, for Pervere, and for the other four principals to some extent, thus serving parties whose interests were sharply in conflict. The true nature of the extent of his solicitude for Pervere's best interests appear from the size of the fee he charged him for legal services of dubious value in a period of but a few months, his causing the sale of Pervere's interest in Pacific Meter to his law partner Joyce, and his instructions to the other principals in Alpha to retain counsel and cause litigation against Pervere for the enforcement of the pre-incorporation subscription agreement.

For all of the foregoing reasons I rule that the pre-incorporation agreement is voidable and not enforceable against Pervere. Hence the bill to reach and apply will not lie against the trustee defendants, or the Prescott C. Pervere Trust. The plaintiff's complaint, therefore, must be dismissed.

■ Defendant's counterclaim seeks an affirmative judgment against plaintiff as Assignee of Alpha "to the extent that there are assets in excess of the liabilities of the corporation." There has been no showing herein that there are any assets in excess of the liabilities of the corporation which concededly, on the record before this Court, is insolvent. Therefore, the counterclaim is dismissed for failure of proof of the cornerstone on which it is premised, namely, the existence of assets of Alpha in excess of its liabilities.

Judgment accordingly.