[L. A. No. 226.   Department One.—June 17, 1897.]

ESTATE OF MARY KAUFMAN, DECEASED. LIZZIE KING, RESPONDENT, v. J. E. BORCHARD, APPELLANT.

PROBATE OF WILL — CONTEST — UNDUE INFLUENCE — FRAUD — VERDICT AGAINST EVIDENCE.—The evidence given upon a contest of the probate of a will, reviewed, and held insufficient to sustain a verdict that the will was obtained by undue influence and fraud, there being no evidence to show that the disposition of property made by the will was by reason of the suggestion of any person, or that it was the result of undue influence or fraud in any respect.

ID. — EVIDENCE — QUARREL BETWEEN TESTATRIX AND DISINHERITED DAUGHTER.—Where the bulk of the property bequeathed was given to the daughters, and only a nominal legacy to the contestant, who was practically disinherited by the free and voluntary act of the testatrix, evidence as to the particulars of a quarrel between the testatrix and

the contestant concerning her marriage, either for the purpose of showing to the jury that the mother had no sufficient reason for disinheriting her daughter, or in order to allow the jury to conjecture that the mother's dislike of her daughter may have been fostered by her other sisters, is immaterial, and irrelevant to the issues of undue influence and fraud.

ID.—NATURE OF UNDUE IFLUENCE—RELATION TO WILL—DESTRUCTION OF FREE AGENCY.—CAPRICIOUSNESS.—The undue influence which will avoid a will must be such as operates upon the mind of the testator at the time of making the will, and must be an influence relating to the will; and unless some fraud or misrepresentation was practiced at that time, or some physical or moral coercion then employed, such as to destroy her free agency, the question of undue influence should not be submitted to the jury, and it is not ground for avoiding the will that it is unjust or capricious, if the person making it has testamentary capacity.

ID.—RIGHT OF TESTAMENTARY DISPOSITION —PREJUDICE OF JURY— JUDICIOUSNESS OF WILL NOT TO BE CONSIDERED.—The right to dispose of one's property by will is most solemnly assured by law as an incident to ownership, and does not depend upon its judicious use; and courts abdicate their functions when they permit the prejudices of a jury to set aside a will merely upon suspicion, or because it does not conform to their ideas of what was just and proper.

ID.—EVIDENCE—REMOTE STATEMENTS OF TESTATRIX AFTER EXECUTION OF WILL.—Evidence as to statements made by the testatrix several months after the execution of the will, is not competent to impeach its validity, and the jury should not be permitted to consider such statements.

ID.—COMPARATIVE MEANS OF BENEFICIARIES AND CONTESTANT.—Evidence is not admissible to show what property the husbands of the daughters who were made beneficiaries under the will possessed, and that the contestant and her husband were comparatively without any property.

ID.—APPEAL FROM JUDGMENT—DISMISSAL—EFFECT OF REVERSAL OF ORDER DENYING NEW TRIAL.—An appeal from a judgment sustaining the contest of a will and refusing it probate will be dismissed if taken more than sixty days after entry of the judgment; but where an order denying a new trial is reversed, such reversal has the effect to set aside the judgment denying probate to the will.

APPEAL from a judgment of the Superior Court of Ventura County and from an order denying a new trial. B. T. WILLIAMS, Judge.

The facts are stated in the opinion of the court.

*Shepherd & Eastin,* and *H. L. Poplin,* for Appellant.

The evidence was insufficient to show fraud or undue influence, and the jury were wrongly permitted to break the will on its notions of what the testatrix should

have done. (*Goodwin* v. *Goodwin*, 59 Cal. 560; *In re Langford*, 108 Cal. 608; *In re McDevitt*, 95 Cal. 17.) Declarations of the testatrix made three or four months subsequently to the execution of the will, being remote from its date, should not have been allowed to impeach the will. (*In re Hess*, 48 Minn. 504; 31 Am. St. Rep. 665; 1 Redfield on Wills, 545, 556.) Undue influence relates only to a present constraint operating upon the mind of the testator at the time of the execution of the will. (1 Redfield on Wills, 534; *Eckert* v. *Flowry*, 43 Pa. St. 46.)

*Barnes & Selby*, and *Orestes Orr*, for Respondent.

The appeal from the judgment must be dismissed, not having been taken within sixty days after its entry. (Code Civ. Proc., sec. 1715; *Estate of Burns*, 54 Cal. 223; *Estate of Harland*, 64 Cal. 379; *In re Fisher*, 75 Cal. 523; *Estate of Burton*, 64 Cal. 428; *Mattingly* v. *Pennie*, 105 Cal. 524; 45 Am. St. Rep. 87; *Estate of Backus*, 95 Cal. 671.) Where fraud is alleged, the declarations of the testator, either before or after the execution of the will, are admissible. (1 Redfield on Wills, 511, 543.) Where there is evidence of undue influence, the subsequent declarations of the testator are admissible to show the condition of his mind, and the effect which the influence had upon him. (*Waterman* v. *Whitney*, 11' N. Y. 165; 62 Am. Dec. 71; *Marx* v. *McGlynn*, 88 N. Y. 358; note to *In re Hess*, 31 Am. St. Rep. 690; 1 Redfield on Wills, 556; *Dennis* v. *Weekes*, 51 Ga. 24; *Canada's Appeal*, 47 Conn. 450; *Roberts* v. *Trawick*, 17 Ala. 55; 52 Am. Dec. 164; *Gilbert* v. *Gilbert*, 22 Ala. 529; 58 Am. Dec. 268; *Stephenson* v. *Stephenson*, 62 Iowa, 163; *Neel* v. *Potter*, 40 Pa. St. 483; *Griffith* v. *Diffenderffer*, 50 Md. 466; *Dye* v. *Young*, 55 Iowa, 433.)

HARRISON, J.—Upon the contest of the probate of the last will and testament of Mary Kaufman, deceased, filed by the respondent herein, a jury was called to try the issues presented thereby, and at the conclusion of

the testimony the contestant conceded that all the issues raised by her contest, except those of undue influence and fraud, should be determined in favor of the proponent, and thereupon withdrew all the issues except these, and the following special issues of fact were submitted to the jury: "1. Was the instrument now offered for probate as the last will of Mary Kaufman, deceased, procured by the undue influence of Mary Borchard, John E. Borchard, Frances Petit, Justin Petit, and John Pujol, or any of them? 2. Was the instrument now offered for probate as the last will of Mary Kaufman, deceased, procured by the fraud of Mary Borchard, John E. Borchard, Frances Petit, and Justin Petit, or any of them?"

The jury answered each of these questions in the affirmative, and thereupon the court made an order denying probate to the will. A motion for a new trial was made and denied, and, from the order refusing probate to the will, and also from the order denying a new trial, the proponent has appealed.

Mrs. Kaufman executed the will in question January 8, 1895, and died on the 11th of the succeeding May. Prior to its execution she had determined to submit to an operation for cancer, which, she was informed, might result unfavorably, and thereupon sent for Father Pujol, her priest, who suggested to her the propriety of making her will. Upon this suggestion, she sent for Mr. Borchard, the husband of one of her daughters, and, at his request, Mr. Shepherd, an attorney, came to her house, and prepared the will in accordance with directions which he received from her, and it was thereupon formally executed in his presence. By the will she gave the bulk of her property to her four elder daughters, and left to the contestant only a nominal legacy. A careful examination of the record, however, fails to show that this disposition of her property was by reason of the influence or suggestion of any person, or that there was any evidence showing that

the will was the result of undue influence or fraud in any respect.

Father Pujol testified that he went to visit her for the purpose of administering to her, and, being there, suggested to her that the operation was dangerous, and inquired whether she had made her will; and, upon her telling him that she had not, suggested that it would be better to make one; that, if she should, it would have no force until after her death, and that, if at any time she was dissatisfied with it, she could make a new one. He also testified that nothing was said between them about the disposition of her property. " We did not say anything of the kind; the only thing that was said was this concerning Lizzie, that she was not willing to leave her anything whatsoever, and I said: 'It will not do, Mrs. Kaufman; you must leave her something. It is true, that she has been a very wayward child, and that she does not deserve the name of being your daughter on account of the way she has treated you; but, notwithstanding that, it will be necessary; you will have to leave her something.' I did not tell her how much it would be necessary to leave her. I left that to her; but I said: 'You must leave her something.' I told her that it was necessary to leave her something to avoid the law, because, I said, 'If you don't leave her anything, your will will be thrown away, and the law demands that you will leave her something.' I did not mention any small amount necessary to put in the will. I said any amount would do to avoid the law, but not saying any amount. I said first five dollars or two dollars or one dollar will do; but, that I said to leave her that much, that I did not." This interview with Father Pujol was on the 4th of January, and on that day, after he had left, Mrs. Kaufman sent for the proponent through Mrs. Petit, another of her daughters, and, on his arrival, spoke to him about making her will, and said she wished to give her property to four of her heirs, naming them, and asked him what he thought of it. " I asked her what about the other heirs—Mrs.

King and her grandson.   Just then she did n't have
much to say; but, at any rate, I named them all, and,
when I came to Lizzie — Mrs. King — she objected
right away.   I told her she ought to divide her prop-
erty into five and a half parts, under the condition,
under the circumstances of the past.   I thought that
the grandson was entitled to one-half of a fifth, and
that she should divide the rest into five parts.   She
said Lizzie should not have anything, and her grandson
should have no land; but she might give him some
money."   She determined to make deeds of her real
estate to her four daughters; and, after considerable talk
upon the mode of division, she finally told Mr. Borchard
how she wished it divided, and to tell the attorney to fix
it up that way.   Borchard further testified: "This talk
was about the deeds, and who should have this or that
piece.   With the will I really had nothing to do.   I
did n't know what was in the will until it was opened.
. . . . When the will was made I was n't in the room,
nor did I know what was in it until it was opened here
by the clerk of the court."   Borchard had two or three
conversations with her prior to the making of the will,
and at some time in the interim he, in company with
Mrs. Petit, visited the attorney, Mr. Shepherd, and in-
formed him of the mode in which the real estate was
to be divided, and on the 8th of January Shepherd
went to the house of Mrs. Kaufman with deeds in
which the descriptions were written out, but without
the names of any of the grantees, and while at her
house wrote in the names of the daughters, as Mrs.
Kaufman directed him, for their respective pieces.
This was in the forenoon of that day, and, after Mrs.
Kaufman had executed the deeds, he took them to his
office to authenticate them by his notarial certificate,
and in the afternoon returned to her house and wrote
the will in accordance with her directions.   Mr. Petit
testified that he had nothing to do with the making of
the will, had no talk with Mrs. Kaufman as to how she
should dispose of her property, and did not know how

the will was made until it was opened after her death. Mrs. Petit was present at the interview between Mrs. Kaufman and Father Pujol; and corroborates his testimony, but it is not shown that she ever had any conversation with her mother, or said anything to her about making her will or disposing of her property. Mrs. Borchard testified that she had no talk whatever with her mother about dividing the property. "I did not know how she was going to dispose of it from any source; I had no knowledge of how she was going to dispose of her real estate, except what I had heard from Mr. Borchard. I had no talk whatever before the will was made in regard to how the property should be disposed of; mother never mentioned to me; I did not know what was in the will." These witnesses, with the exception of Father Pujol, were called by the contestant, and were the only witnesses who gave any testimony relative to the circumstances attending the execution of the will, and the testimony above given was neither contradicted nor impeached; and, as it fails to show that the will was executed under an undue influence or fraud, we must hold that it fails to sustain the verdict of the jury.

In April, 1890, the contestant was living with her mother, and was then unmarried. The farm upon which they were living had been rented in the previous November, for the term of one year, to a man named King, who after the lease was made lived at the house with them. It was rumored that Lizzie and King intended to marry each other, and the mother was greatly opposed to this marriage. A serious quarrel took place between them one evening, in which a personal assault was made upon the mother, and the next day, apparently by an agreement of all parties, she left the house and went to live with Mrs. Borchard. The day after she left, Lizzie and King were married, and continued to occupy the farm until the expiration of the lease, the following December, when they left that vicinity, and Lizzie never afterward saw or communicated with

her mother.    After they had gone Mrs. Kaufman returned to her place and continued to live there until her death.    The greater part of the record is taken up with the circumstances of this quarrel between Lizzie and her mother, apparently either for the purpose of showing to the jury that the mother had no sufficient reason therein for disinheriting her daughter, or in order to allow the jury to conjecture that the mother's dislike of Lizzie may have been fostered by her other sisters.    Whatever may have been the reason for its introduction, it was immaterial and irrelevant to either of the issues submitted to the jury.

The undue influence which will avoid a will must be such as operates upon the mind of the testator at the time of making the will, and must be an influence relating to the will itself.    (1 Redfield on Wills, *534; Schouler on Wills, sec. 232; *Eckert* v. *Flowry*, 43 Pa. St. 46.)    Upon this proposition the court said in the case last cited: "Unless there was some evidence tending legitimately to prove that some fraud had been practiced upon the testatrix at that time, or that some misrepresentation had then been made, or that some physical or moral coercion had been employed, such as to destroy her free agency, the court erred in submitting to the jury the question whether undue influence had been exerted.    It was inviting them to find as a fact that of which there was no evidence, and which the law as well as reason presumed had no existence." If the person has testamentary capacity, his will cannot be avoided on the ground that it is unjust or capricious. The right of absolute dominion over his property is sacred and inviolable, and whatever may be his motives, or however great or unfounded his dislikes or his resentments against those who might be thought worthy of his bounty, his will in the disposition of his property is paramount.    (1 Redfield on Wills, *525; *Woodward* v. *James*, 3 Strob. 552; 51 Am. Dec. 649; *Clapp* v. *Fullerton*, 34 N. Y. 190; 90 Am. Dec. 681; *Estate of McDevitt*, 95 Cal. 17.)    "The right of a testator to dispose

of his estate depends neither on the justice of his pre-
judices nor the soundness of his reasoning. He may
do what he will with his own, and, if there be no defect
of testamentary capacity, and no undue influence or
fraud, the law gives effect to his will, though its pro-
visions are unreasonable and unjust." (*Clapp* v. *Fuller-
ton, supra.*) "The right to dispose of one's property by
will is most solemnly assured by law, and is a most valu-
able incident to ownership, and does not depend upon
its judicious use. The beneficiaries of a will are as much
entitled to protection as any other property owners, and
courts abdicate their functions when they permit the
prejudices of a jury to set aside a will merely upon sus-
picion or because it does not conform to their ideas of
what was just and proper." (*Estate of McDevitt, supra.*)

Testimony was given by one witness that in a con-
versation with Mrs. Kaufman about three weeks before
her death she said to him that she did not make a will
and did not know what was in the will; that she was
sorry Lizzie was not in the will, and that she wanted to
give Lizzie the same as the others, and that she did not
feel safe if she should make another will. This state-
ment, made by her several months after the execution
of the will, was not competent to impeach its validity,
and the jury should not have been permitted to consider
it. (*Estate of Calkins*, 112 Cal. 296.)

The court permitted the contestant, against the objec-
tions of the proponent, to give evidence of the amount
of property owned respectively by the husbands of the
beneficiaries under the will, and also that the contest-
ant and her husband were comparatively without any
property. The evident object of this evidence was to
give to the jury the impression that the contestant had
been unjustly treated in the division of her mother's
estate, and it should have been excluded by the court.
Aside from the fact that Mrs. Kaufman had the right
to exclude the contestant from the will if she so desired,
the testimony was neither relevant nor competent for
the purpose of sustaining either of the issues before the

jury, and its introduction could have only a prejudicial effect upon their minds. When the validity of a will is contested upon the ground of undue influence in its execution, a court cannot be too careful in excluding from the consideration of the jury evidence that is incompetent or irrelevant to establish the charge. The very nature of the issue, as well as the lack of experience and of mental training on the part of the jurors in reference thereto, render them less able than the court to weigh the sufficiency of any evidence that may be offered upon this issue. The fact that the evidence has been permitted by the court to come before them justly authorizes them to consider that it is both relevant and competent for that purpose, and the evidence so received will, unconsciously it may be, produce an impression upon their minds which will not be effaced by subsequent instructions.

A motion is made to dismiss the appeal from the judgment denying probate to the will upon the ground that it was not taken until more than sixty days after its entry. This motion must be granted, although the reversal of the order denying a new trial will have the effect to set aside the judgment denying probate to the will.

The appeal from the judgment is dismissed. The order denying a new trial is reversed and a new trial ordered.

VAN FLEET, J., and GAROUTTE, J., concurred.

Hearing in Bank denied.