[S. F. No. 2594. In Bank.—August 5, 1902.]

In the Matter of the Estate of CLARA L. TIBBETTS, Deceased.　JOHN C. TIBBETTS, Respondent, v. SARAH A. DYER, Appellant.

PROBATE OF WILL—CONTEST—UNDUE INFLUENCE—PROVINCE OF JURY—CONFLICT OF EVIDENCE—APPEAL.—Upon the contest of a will for undue influence, it is the province of the jury to weigh the evidence, to pass upon the credibility of witnesses, and to find the facts; and where the evidence was conflicting, and not entirely insufficient to support a verdict against the probate of the will, though the verdict might with propriety have been the other way, this court cannot say upon appeal that it was entirely outside of the legitimate province of the jury.

ID.—EVIDENCE—HOSTILITY OF DEVISEE TO HUSBAND OF DECEASED.—Evidence upon such contest tending to show animosity or friendliness is admissible, although occurring before or after the main event, if not too remote in time. It was not error to admit evidence that the mother of the deceased, who was the devisee of her will, would not

allow her husband, the contestant, to have anything to do with the funeral of his wife or to see her body.

ID.—DECLARATION RELATIVE TO MARRIAGE—HARMLESS EVIDENCE.—Evidence that shortly after her daughter's marriage to the contestant the mother declared her willingness that her other daughters should marry old men as well off as she had married is not clearly inadmissible, under the circumstances, but, even if not admissible, is of too little importance to be prejudicial or to warrant a reversal of the judgment.

APPEAL from a judgment of the Superior Court of Santa Cruz County and from an order denying a new trial. Lucas F. Smith, Judge.

The facts are stated in the opinion of the court.

Carl E. Lindsay, for Appellant.

W. D. Storey, for Respondent.

McFARLAND, J.—This is a contest of the will of Clara L. Tibbetts, deceased. Her mother, Sarah A. Dyer, is the proponent, and John C. Tibbetts, the surviving husband of the deceased, is the contestant. The question was whether or not the will was the result of the undue influence of the mother, and of the sisters of the deceased, Mary R. Dyer and Minnie G. Trumbley, and of her half-brother, Fred L. Stevens, or any of them. This question was submitted to a jury as a special issue. The jury answered in the affirmative, and judgment was rendered denying the probate of the will on the ground of the alleged undue influence. The proponent appeals from the judgment and from an order denying a new trial.

The main contention of appellant is, that there is not sufficient evidence to warrant the jury in finding the fact of undue influence. The case is undoubtedly a very close one, when considered in the light of former decisions of this court cited by appellant, and particularly the decisions in *Estate of Mc-Devitt*, 95 Cal. 17; *Estate of Langford*, 108 Cal. 608; and *Estate of Wilson*, 117 Cal. 269,—all of which cases were beyond doubt correctly decided, and rightly declare the law touching the subject of the contest of wills. But, after mature consideration of the case at bar, we have reached the conclusion that the evidence was not so entirely insufficient to support the finding

of undue influence as to warrant us in disturbing the verdict. The verdict might with propriety have been the other way; but we cannot say that it was entirely outside the legitimate province of the jury.

The facts here are, in important particulars, different from those in the cases above cited. In the McDevitt case it appeared, among other things, that there was no evidence that "the subject of the testamentary disposition of his property was ever mentioned to the brother Andrew," who was charged with the undue influence, or that the latter knew of the execution of the will until after the death of the testator. The will in that case, after its execution, "was taken away by the attorney, and there was no proof that any member of Andrew's family knew of it." In the Langford case the testator, when he concluded to make his will, went, two or three weeks prior to its execution, "entirely alone to his attorneys," talked his business affairs over with them freely and fully, and gave specific directions as to the provisions of the intended will. He called on his attorneys several times before the draft of the will was completed, and then executed it in their law office, in the absence of his wife, who was accused of the undue influence, and three years afterwards he republished it with a codicil. The facts in those two cases connected with the immediate execution of the will were very different from those of the case at bar. In the Wilson case the only point decided was in relation to the mental soundness of the testatrix when she made the will.

In the case at bar, as we affirm the judgment, it is not necessary to state the evidence with much detail; but as it is contended that this case is within the cases above cited, we will notice the general features of the present case. The deceased and the respondent were married at Santa Cruz, California, on April 15, 1897. He was seventy years old, and she thirty. They immediately went to Chicago, Illinois, and remained there a year, and then returned to Santa Cruz, arriving there in the latter part of April, 1898, where they continued to reside until her death on February 3, 1900. The will in question was executed on May 31, 1899. The relations between them were, beyond doubt, pleasant and affectionate until after their return to Santa Cruz. While they were in Chicago he conveyed to her some real property there, worth about ten thousand

dollars, and she at the time of this conveyance, and before it was executed, promised to make a will devising it to him, so that in the event of her death before his it would go back to him; and she did make such will. The property devised in the will which is here contested is the property which the respondent conveyed to the deceased in Chicago. Two or three months after their return to Santa Cruz unpleasantness and hostility arose between the mother and sisters and brother of the deceased, on the one side, and the respondent, on the other. As to the cause of this hostility there is a sharp conflict of evidence,—the mother claiming that the deceased, who was in bad health, was not properly cared for by the respondent, that he would not employ a physician, that she had too much work to do, etc., and that these things caused the unpleasantness. Respondent denied these charges, and asserted that the mother unduly interfered with his domestic affairs, and said and did things calculated to prejudice his wife against him. As to these matters the jury, no doubt, found for the respondent, and the evidence being fairly conflicting their finding cannot be disturbed. He said that, in the presence of his wife, the mother said many unpleasant and harsh things to him: that he was a "nonentity"; that "my wife ought not to stay with me"; that "my wife owned one half of the home, and that she [Mrs. Dyer] had as good a right there as I had; and that she would set her boys on me, and would have me tarred and feathered, or the boys would have me tarred and feathered." He also testified that in the first part of December, 1898, Mrs. Dyer and the said Stevens came to his house; that the latter would not shake hands with him, and said "he had heard of the conversation I had had with his mother, and did not want anything to do with me, that he came to my house because he wanted to, that he would come to my house when he wanted to, and stay as long as he pleased and would go when he got ready. Mrs. Dyer said, 'You ought to have your mug smashed.' Neither Mrs. Dyer nor Fred Stevens have been in my house since that time. This conversation was in the parlor, in the presence of my wife."

There was evidence to support a belief by the jury that the deceased was always affectionately attached to her husband, notwithstanding the hostility of her family, and that the latter endeavored to destroy her affection for him. A witness said

that in August or September, 1898, she was at Mrs. Dyer's home with Mrs. Tibbetts, when the sisters were present, and testified as follows: "They were talking about the trouble between Mr. and Mrs. Tibbetts; thought she ought to leave him; thought she could have his property; one suggested that she send back to Chicago and get her share of the rents. Mrs. Tibbetts replied that the rents would not support her. Then one of them suggested that she should get a divorce. On the way home from Dyer's Mrs. Tibbetts said she loved her home and did n't want to leave." The same witness further testified as follows: "In the month of July, 1899, [the second month after the execution of the will,] I had a conversation with Mrs. Dyer at Olive Springs. She said that she did not want Mr. Tibbetts to come back to Mrs. Tibbetts any more; that she had cured her up three times and was tired of it. Mrs. Tibbetts told me at that time Mr. Tibbetts was just as good as he could be, but her mother would not believe it; she had told her mother so, but she would not believe it." At that time the deceased and her mother were stopping together at said springs; and there was evidence that when the husband went there once a week, to take some things which were needed, the wife always met him on the opposite side of the creek, and insisted that he should not go near the house, because her mother was so much opposed to him that she did not want him to come in her sight. During the last sickness of deceased, when she was at her mother's house, the respondent was prevented by the family from seeing her, or from going into the house; and he was not allowed to have anything to do with the funeral or to attend it as a mourner. Mrs. Dyer, on cross-examination, admitted that she had conversations with the deceased about the disposition of her property by will, and that she knew that it was to be devised to her. The facts immediately connected with the execution of the will are these: The brother, Stevens, went to a conveyancer and said to him that his sister (the deceased) wanted a will drawn giving her property to her mother. There was evidently conversations between Stevens and the conveyancer about the situation of the parties and property, for the latter "suggested that she had better leave her husband fifty dollars, or something like that." He prepared a will and gave it to Stevens, who paid him for his work and took the will away. Afterwards the deceased

met the conveyancer in front of the City Bank where his office was. She drove up with her mother in a buggy. She had the will with her, and went into the bank with the conveyancer and executed it. He testified: "The only time I saw Mrs. Tibbetts in connection with the will was the time she came with the mother to have it signed; she never gave any directions about the preparation of it." After the execution of the will the deceased immediately took it to the buggy and delivered it to her mother. None of these facts immediately preceding the preparation and execution of the will could have occurred at the house of respondent, for none of the mother's family had been at that house for several months previous to that time. At the time of the execution of the will, and for some months before and after that time, the deceased was "very ill," although her mind was shown to be sound. There was other testimony bearing on the issues involved; and we are not prepared to say that the evidence was, as matter of law, insufficient to sustain the verdict.

In justice to the appellant, it is proper to remark that there was evidence tending to show that the will was not the result of the undue influence charged. We are not called upon to say that the jury accurately weighed the evidence, properly determined where the preponderance was, and arrived at a correct logical conclusion. It is the province of the jury to weigh the evidence, to pass upon the credibility of witnesses, and to find the facts; and where there is a fair conflict of evidence touching the very point at issue this court cannot rightfully overturn the verdict. Where, however, there is really no substantial evidence to support a verdict, or the jury were evidently actuated by motives which they had no right to consider,—as is so frequently the case in contests of wills, —there this court will hold that, as matter of law, the verdict is unwarranted, even though there be some slight pretense of evidence to support it; but the case at bar does not come within that rule.

The transcript shows some exceptions to rulings of the court on the admissibility of evidence; but only two of them are urged in the briefs. The first of these is the allowance by the court of testimony to the point that appellant and her family would not allow respondent to have anything to do with the funeral of his wife or to see her body. This ruling was not

erroneous. Evidence tending to show animosity or friendliness is admissible, although occurring before or after the main event, if not too remote in time; and considerably less than a year had elapsed between the making of the will and the death of the testatrix. The other objection is to the allowance of the testimony of a witness that a short time after the marriage, in response to a remark made by the witness about her daughter's marriage, "she [Mrs. Dyer] said she would be willing for her other two daughters to marry old men as well off as Clara had married." It is not clear that, under the circumstances of this case, the testimony was not admissible; but, without passing definitely on that point, it is sufficient to say that the evidence was of too little importance to be prejudicial or to warrant a reversal.

The judgment and order appealed from are affirmed.

Henshaw, J., Van Dyke, J., Garoutte, J., and Beatty, C. J., concurred.

Harrison, J., and Temple, J., dissented.

Rehearing denied.