[Civ. No. 2964. Third Appellate District.—July 28, 1925.]

In the Matter of the Estate of LAURA JANE CARSON, Deceased. LAWRENCE E. CARSON, Appellant; EMMA JEANETTE CHASE, Respondent.

[1] ESTATES OF DECEASED PERSONS—WILL CONTEST—UNDUE INFLUENCE—VERDICT—EVIDENCE.—In this will contest, the evidence was insufficient to support a verdict of undue influence.

[2] ID.—UNDUE INFLUENCE—CIRCUMSTANTIAL EVIDENCE.—Undue influence may be established by circumstantial evidence, but it must, however, do more than raise a suspicion. It must amount to proof, and such evidence has the force of proof only when circumstances are proven which are inconsistent with the claim that the will was the spontaneous act of the alleged testator.

[3] ID.—AVOIDANCE OF WILL—CHARACTER OF UNDUE INFLUENCE.—Undue influence, however used, must, in order to avoid a will, destroy the free agency of the testator at the time and in the very act of the making of the testament. It must bear directly upon the testamentary act; and the fact that a testator with such qualifications makes a foolish, unnatural, or unjust will, does not show that undue influence caused the will.

[4] ID.—UNSOUNDNESS OF MIND—OPINION—EVIDENCE.—The opinion of a witness that a person is of unsound mind can be no stronger

---

2. See 26 Cal. Jur. 760.

3. General rule at to what constitutes undue influence, notes, 16 A. L. R. 450, 17 A. L. R. 218. Undue influence which will vitiate note, 16 Am. Dec. 257. See, also, 26 Cal. Jur. 644; 28 R. C. L. 137.

than or of superior evidentiary weight to the reasons upon which he bases his opinion.

[5] ID.—STRENGTH OF MIND—UNDUE INFLUENCE.—If the will is executed on the day when the mind is strong enough to resist the undue influence, if any there be, the will must be sustained.

[6] ID. — RELATIONSHIP OF HUSBAND AND WIFE — PRESUMPTIONS. — Where a husband is charged with having exerted undue influence over his wife in the making of her will, no presumption is permitted to be indulged against such relationship of husband and wife.

(1) 40 Cyc., p. 1165, n. 87. (2) 40 Cyc., p. 1164, n. 83. (3) 40 Cyc., p. 1145, n. 55. (4) 40 Cyc., p. 1041, n. 58. (5) 40 Cyc., p. 1145, n. 55. (6) 40 Cyc., p. 1153, n. 15.

APPEAL from a judgment of the Superior Court of Sacramento County. Peter J. Shields, Judge. Reversed.

The facts are stated in the opinion of the court.

Lee Gebhart and Theodore W. Chester for Appellant.

H. W. Zagoren, Markham Johnston and Howe, Hibbitt & Johnston for Respondent.

ANDERSON, J., *pro tem.*—Laura Jane Carson of Sacramento County died testate on or about the eighth day of February, 1923, leaving her, surviving, Lawrence E. Carson, a husband, and Mrs. Emma Jane Chase, a daughter. Deceased was eighty years of age past. Her will was executed February 1, 1923, while she was ill with pneumonia. In this will Lawrence E. Carson, her husband, was named executor; a legacy of $10 was left to Emma J. Chase, a daughter; a legacy of $500 to Carrie Johnson, a niece, and the residue was left to the husband. The estimated value of the estate was about $7,000. She had, several months before, conveyed other property to the husband. The validity of the will was contested by Mrs. Emma J. Chase, the daughter. The grounds of contest were unsoundness of mind and undue influence. The undue influence was alleged to have been exercised by the husband, Lawrence E. Carson.

4. See 26 Cal. Jur. 745.
5. See 26 Cal. Jur. 651; 28 R. C. L. 141.

The case was twice tried by the court, sitting with a jury, and upon each trial the court refused to submit the question of unsoundness of mind to the jury. On the second trial the jury rendered a verdict in favor of the contestant on the question of undue influence.

The contention of appellant is that the verdict of the jury is not substantially supported, or supported at all, by evidence, and that the question of undue influence should not have been submitted to the jury.

It is also contended that the court erred in permitting a nonexpert witness to express an opinion on the question of unsoundness of mind, particularly as the court had at the first trial granted a nonsuit on the question of unsoundness of mind and no appeal had been taken therefrom.

[1] It will be necessary to refer to the evidence to determine as a matter of law whether the evidence substantially and fairly supports the verdict of undue influence.

It seems that the contestant's mother and father separated (whether or not they were divorced does not appear) about the year 1910; the exact time is unimportant. Before the separation they were living in a home which the mother had built (the evidence is not clear as to whether or not this was the mother's separate property before marriage). The mother continued to live in this house until her death. After the separation the father lived a few years in Sacramento in a separate residence and the daughter lived with the mother. Thereafter the father moved to Los Angeles and in a few years the daughter went to Los Angeles to live with the father. This residence continued for a duration of about sixteen years, until the father's death. The father accumulated apparently $12,000 worth of property, several thousand of which were used by him in his last sickness, according to the testimony of the daughter. The balance was given to the daughter. During this period of sixteen years the daughter visited the mother once. After the death of the father the daughter returned to live with the mother and continued to live with her until August 4, 1922. The daughter's maiden name was Burke. It does not appear when she was married. It appears from the evidence that it was the father's desire that the daughter should keep the property he gave her for herself, and if there was anything left it should be given to orphan children. The daughter

testified that she told her mother this. She testified in her deposition first taken to that effect, and at the trial testified that she told her mother when "we" are through with it, it is to go to the orphans. There is testimony in the record to the effect that the mother had said that as the daughter, Mrs. Chase, was going to follow the father's wishes and the daughter did not intend to give the mother any of her property, she would see that the daughter received none of hers. There is also much evidence in the record to the effect that the mother was fearful that the daughter was trying to get the mother's property so that it might be given to the church. This seems to have worried the mother much, and immediately after the will was made she remarked to the nurse: "I can rest easy now, the Minister, Rev. Bartlan, and the rest of them cannot spend my money." She made other declarations that the daughter spent too much money in the church, and she also told many people that she was usually left alone, the daughter was not much company to her as she practically lived in the church. The daughter admitted she spent much of her time with the church. This is corroborated by the Rev. Bartlan: "Q. Did she frequently attend every night in the week? A. Yes, I think I can say yes. Q. In regard to the daytime, did she have occasion to visit your church in the daytime? A. Once or twice a week she might come up there for services in the church. Q. Did she have any particular duties or any services she performed there? A. Yes, she had. Q. The question was, what were the usual hours that she was in attendance, had any activity with the church? A. At night. Q. At night? A. It would vary from 10:30 to 11:30, perhaps later, sometimes later." We quote further to show the influence the minister had with the said daughter: "Q. What did she say in regard to leaving Sacramento prior to August? A. Well, she asked me whether it would be advisable for her to leave Sacramento, detailing the circumstances of her environment at her home. Q. And you told her what? A. I advised her to leave, at least temporarily. Q. Did Mrs. Chase go to Oakland? A. Yes. Q. And do you know when she returned? A. About a week after her mother's death."

When the trouble occurred between Mr. Carson and Mrs. Carson, as will appear further on, because Mr. Carson went away, about August 1, 1922, it seems that the Rev. Bartlan

was present with the mother and daughter on the way to Attorney Dunn's office, apparently to talk about the divorce matter.

About the month of February, 1921, Lawrence E. Carson, the proponent, went to work at the home of Laura Jane Burke at Thirtieth and B Streets, Sacramento. Soon thereafter he was given a room, and he did garden work a short time. Prior to this he had been discharged, it seems honorably, from the United States Army; this was his second enlistment. It will be necessary to refer to this again. There is some dispute as to his age, and we deem it fair to say it was slightly upward of fifty years, while Mrs. Burke's age was slightly upward of eighty years. This acquaintanceship grew into a marriage at Marysville, November 7, 1921. After the marriage they lived at the old home residence of Mrs. Carson, together with her daughter. Then came the old story of the child objecting to a parent marrying a younger person, or anyone else. The evidence reveals the attitude of some of the neighbors sympathizing with the daughter by reason of the marriage; some of them refused to visit Mrs. Carson. This trouble between Mr. and Mrs. Carson occurred early in August, 1922, when Mr. Carson went to the southern part of the state to see his daughter by a former marriage. He did not inform his wife that he was going away at the time he left. The evidence, and a fair inference therefrom, reveal that something occurred which entirely turned Mrs. Carson against her husband. Attorneys were consulted, divorce was discussed, ministers of the gospel apparently appealed to, banks were visited, safe-deposit boxes were searched, the husband was accused of taking valuable documents away, etc. At about the time the fever of excitement was highest the husband returned. The explanation of the husband seemed to satisfy the wife; but the daughter, about the fourth day of August, 1922, very clandestinely left the city and did everything she could thereafter to conceal her whereabouts from her mother, and never again, it seems, tried to see her mother, although she was in Sacramento a month before the mother's death and was further notified of her mother's last illness, which notice she admitted receiving.

It is at least insinuated by the contestant that Carson was not the right man for Mrs. Carson to marry, that he was too

young, etc.  This could be said more effectively in *Estate of Anderson*, 185 Cal. 700 [198 Pac. 407], and many other cases; every case of the kind depends largely upon circumstances.  Carson may be called a gambler because he had something to do with cards upon a certain occasion.  He may be considered not thrifty because he did not own much of this world's possessions, but one fact stands out all through the testimony, that he was always willing to work and did work.  This naturally appealed to Mrs. Carson, as she, it seems, had worked hard all her life, and it is a matter of common experience that people who have worked hard for a living do have much respect for people who perform manual labor.  If he did not have much means, it must be borne in mind that many years of his life were spent in the army and everyone knows that the government does not pay very much.  He did well to save what he did from his last enlistment.  He claimed to have deposited several hundred dollars in a well-known San Francisco bank at a certain time.  Contestant seemed to doubt this.  If Carson was not telling the truth about this there was ample time to impeach his statement by evidence that would be indisputable, but this was not done and it might have been important for contestant if it could have been done..  He met Mrs. Carson shortly after he left the army at the conclusion of the World War.  At that time enthusiasm for the soldier had not yet subsided, as it sometimes unfortunately does in time, and so Mrs. Carson may have been very proud to claim, as we might say, an old soldier for a companion.  There may have been other reasons why she might have liked him, although others might not, but we have no concern with that.  There is, however, abundant evidence in the record to show that he was kind to her, he even did much of the housework, and this while performing his daily garden work for others, and he seems always to have been at home at night with her.  Many witnesses testified that Mrs. Carson often declared that her life had been made happy and her work and duties much easier after her marriage to Mr. Carson and that she wished she had met him long before she did.  Much of the record is taken up with testimony in relation to what his earnings were before and after the marriage, and about the placing of the husband's name in certain instruments and not put-

ting it in others, etc., and putting it on and taking it off of safe-deposit boxes. The most of the matters in relation to this occurred about the time the trouble happened in August, 1922, and we think it shows that Mrs. Carson had strength of mind sufficient to do as she pleased and expressed herself with considerable firmness even, according to the daughter's testimony. It seems that Mr. Carson had nothing to do about putting his name in the Hartman mortgage, one of the instruments it appears he was accused of having taken away with him at the time of his absence. Mr. Hartman, the mortgagor, explained this quite fully. Mr. Carson seems to have had but little education and practically no business knowledge. He probably did think that if the home should be placed in his name, he being a discharged soldier, they would escape the taxes. Another matter which is much stressed is: The daughter stated that Mr. Carson urged the testatrix to deed her home to him in order to escape payment of taxes, he being an ex-soldier, and that when the testatrix refused "he told her he would go down and see Judge Glenn and have her declared incompetent and . . . get it that way." Mr. Carson denied this but testified: "I told her that Mrs. Chase had run away with her money and her securities. . . . I told her I would go before the Superior Court, if she wanted me to, and have the Public Administrator take care of her affairs. She told me no, rather I attend to her affairs"; he said he thought this would be a relief for Mrs. Carson as she was at that time so nervous, no doubt on account of the quarrels between the daughter and husband. Had it been his intention to do this, surely he was not then trying to exert undue influence upon Mrs. Carson, because such an act probably would have entirely destroyed the possible results of the undue influence, had any been attempted. He may have said, "Jennie is crazy," referring to Mrs. Chase, but he had a right to his own opinion, and this was merely opinion. However, according to the mother, the daughter Jennie was "peculiar" and had "spells," but statements by the husband against the daughter, if the mother had any great affection for her, would only tend to make the mother cling more closely to her daughter out of pity for her, thus defeating the effect of any purpose that may have been intended. This feature is re-

vealed and commented upon in *Estate of Bryson,* 191 Cal. 521 [217 Pac. 525], and in other cases.

At least three reasons appear why the daughter was not provided for in the will, any one of which might have been sufficient to produce the terms of the will. First, it appears from the testimony that Mrs. Chase told her mother what her father told her she should do with the property he had given her (Mrs. Chase). It does not appear what occasioned the separation between the father and mother, but it seemed to be sufficiently strong to last until death. No doubt the mother reasoned that the daughter cared more for the father than she did for the mother, as she seemed to adhere so steadfastly to his wishes, and it is not hard to believe that she declared, in effect, that "Jennie shall not have any of my property as she does not intend to give me any of hers." The second reason is that she no doubt encouraged her mother to believe Mr. Carson took her papers away and that he probably had no intention of returning, and she no doubt did what she could to turn the mother against him, and when the husband returned and explained everything, apparently to the satisfaction of the mother, Mrs. Carson probably then felt her husband had been wronged. This no doubt intensified her feeling for Carson, if anything was lacking before. Our supreme court, in *Estate of Wilson,* 117 Cal. at page 279 [49 Pac. 172, 177], comment upon the effect of such a reconciliation: "But during her last sickness, and after she had made the will of February 27th, her husband frequently went to see her, and they were often together alone; and it was quite natural that, under these circumstances, her animosity to him should soften, as it evidently did." It was but natural for the mother then to criticise the daughter, probably charging her with trying to cause her to divorce her husband, which the daughter resented by leaving. If any hope still remained for her to be the recipient of her mother's bounty, in the face of the last two reasons against her, she must have destroyed every vestige of chance by concealing her whereabouts and permitting only the minister, Rev. Bartlan, to know where she was, the minister refusing to tell the mother at all because the daughter had warned him not to, thus aggravating an already very tender grievance with the mother, caused by the daughter paying too much heed to the minister's advice.

Naturally this would influence the mother more against both the minister and the daughter, and she gave expression to these feelings at the time she made the will, as before quoted, but the effect of this conduct was augmented and reinforced by what must have appeared to the mother as nothing less than cruelty when, in her last sickness, she had a telegram sent to the daughter stating she was very ill and asking her to come, the daughter receiving the message but making no reply. The telegram was sent about seven days before the mother died, and the daughter could have responded in person in less than twenty-four hours, or, had she been ill, as claimed, she could have afforded her mother the consolation of a message in recognition of the telegram; this might have, even at this late date, caused the mother to redraft the will. The mother died February 8th. About a week after the mother was buried the daughter returned to Sacramento, according to Rev. Bartlan's testimony. With these reasons before us we cannot say that the will does not express the wishes of the testatrix, and upon this we quote from *Estate of Bryson,* 191 Cal., at page 541 [217 Pac. 525, 533]; "'In order to establish that a will has been executed under undue influence, it is necessary to show, not only that such influence has been exercised, but also that it has produced an effect upon the mind of the testator by which the will which he executes is not the expression of his own desires' (*Estate of Calkins,* 112 Cal. 296 [44 Pac. 577])." . . . "'constraining him to make a disposition of his property contrary to and different from what he would have done had he been permitted to follow his own inclination or judgment. (*Estate of Kilborn,* 162 Cal. 11 [120 Pac. 762].)'"

The daughter stated in explanation of her failure to answer the telegram, that she thought the telegram was sent as a hoax to induce her to come home, and also that she was ill at the time the telegram was read to her. The daughter may have been actuated by what she considered the best of motives by refusing to see and concealing herself from her mother, but that does not soften the harshness of her conduct as it must have appeared unexplained to the mother, and we can only consider what would be the usual effect of her conduct upon the mother, and we feel that this would be the same whether the mother was strong or weak, sick or well, but the effect probably would have been aggravated

had she been, as the daughter claimed, sick and weak. We find no place in the testimony where Mr. Carson tried to keep the daughter from visiting the mother when Mrs. Chase was in Sacramento in January, 1923, or at any other time before the mother was taken ill. In the letter Mrs. Schardin wrote about the first of January, 1923, Mrs. Carson had her write Jennie that she would not make her any trouble if she would return the papers, and told her to tell her also that she had deeded the home place to Mr. Carson. The daughter did not answer the letter, but apparently received it, as about January 8th she came to Sacramento and returned the papers. In regard to the papers, the following occurred in the testimony of Rev. Bartlan: "Q. Did she inform you at any time prior to her departure in August, 1922, about having papers and moneys, etc., belonging to Mrs. Carson? A. I doubt it very much, I don't remember. Q. Will you say she did not? A. I cannot be pinned down, I do not remember." Rev. Bartlan also testified in regard to the papers of Mrs. Carson: "Q. Will you state what was said by her and by yourself at that time regarding the disposition of the papers? A. I told her I was glad she came back and had restored the papers."

When Mrs. Carson had Mrs. Schardin state in the letter to the daughter that she had deeded the home place to the husband, this put Mrs. Chase on notice so she could have interviewed the mother when she came to Sacramento on this January trip and she could have ascertained then, if she desired, if Mr. Carson had used any undue influence or force to procure the deed, and, if justified, thus would have had the mother's assistance to prove the undue influence, if any had been exerted; but she did not attempt to go near her mother for any purpose.

Instead of the will being an unnatural will, it is only a fair illustration of the ordinary display of the operation of natural resentment by a parent of real or fancied wrongs. The cases are full of instances where the reasons for the resentment were more indirect and more trifling as compared with the reasons here shown and no doubt were the turning point against the child, and in some cases the beneficiary disgustingly encouraged the resentment. We refer to one case cited by our supreme court in the *Estate of Kaufman,* 117 Cal. 288 [59 Am. St. Rep. 179,

49 Pac. 192], being *Clapp* v. *Fullerton*, 34 N. Y. 190 [90 Am. Dec. 681]. Mrs. Carson may not have reasoned like a philosopher, but it cannot be said that she did not reason as a majority of people would when angered, as she probably was about the daughter's intention as to the disposition of her own property and at the way her daughter left her and apparently ignored her wishes to the last. Common experience teaches us that a child, or anyone else, expecting to be the recipient of the bounty of others, who gives cause for anger and resentment, does so at his peril. If, then, Carson took the other course, and by being kind and considerate thereby gained the testatrix's affections and bounty, it was legitimate, and we must permit it to have its proper effect. The supreme court, in the *Estate of Donovan*, 140 Cal., pp. 394 and 395 [73 Pac. 1081, 1082], quoting with approval a decision in another jurisdiction, speaking of the effect of kindness, etc., say: " 'If a wife by her virtues had gained such an ascendency over her husband, and so riveted his affections that her good pleasure is a law to him, such an influence can never be reason for impeaching a will made in her favor, even to the exclusion of the residue of his family.' "

Mr. Carson was not present when the will was executed and we find the unusual condition in this case of the one charged with exerting the undue influence with having advised the testatrix not to make a will at the time she did. He said to her: "That she had been ill before just like that, and she would be all right in a few days." Upon the question of resentment and dislikes, we quote the following from Mr. Freeman's notes in *In re Hess*, 31 Am. St. Rep., at page 680: "The fact that the testator was prejudiced against or had an aversion for some of the natural objects of his bounty, and therefore disinherited them in favor of others, whether related to him or not, does not establish undue influence, though the will is clearly the fruit of his resentment and dislike: (citing cases). Nor, when family dissensions arise, will the fact that a child not only shared in the feelings of his parent respecting the conduct of another child, and perhaps kept alive and increased the parental resentment, constitute undue influence vitiating a will in favor of the former and against the latter: *Woodward* v. *James*, 3 Strob. (S. C.) 552 [51 Am. Dec. 649]."

Unusual proof is furnished in the instant case of the deliberate act in the execution of the will. It is first shown that the testatrix, herself, directed arrangements to be made for its execution. When the attorney arrived a reasonable range of discussion followed between himself and the testatrix and, after ascertaining the wishes of Mrs. Carson, Mr. Gebhart began preparing the will. Before it was finished the doctor arrived and Mrs. Carson discussed matters in his presence and, after the doctor read the will to her, and she had signed it, he, with the attorney, signed as witnesses. The attorney left, taking the will with him. About the time he was leaving the nurse had returned from another patient she had been attending and Mrs. Carson told her she arrived too late to be present when the will was made, but seemed relieved that the task was over and said: "I can rest easy now," etc. And she told the nurse how she had made the will and how happy she had been with Mr. Carson and told her that she had told the daughter before, "That she did not need to expect anything from her," etc. Whatever insinuations may be made against the attorney or Mr. Carson by the contestant, we are unable to see the slightest suspicion that could attach to the doctor or the nurse. No one even attempted to question their honesty and standing in the community and no impeachment of their testimony was even attempted. It seems that such direct evidence stands out so strongly that nothing less than the most convincing circumstantial evidence should be permitted to overcome such testimony. No one could doubt that they were innocent of any knowledge of any wrongdoing. According to their description of what took place, the conclusion is irresistible that Mrs. Carson was able to and did keep in mind all things necessary to qualify her to make a will, and was, at the "very time and in the very act" free to act and capable of acting in the execution of her will.

Contestant seemed to think Mrs. Carson should not have changed attorneys. It does not appear that Mrs. Carson had occasion to employ an attorney many times. It would be difficult to try to account for the reasons why people change or select their attorneys. It may be that Mrs. Carson, after Mr. Carson came back and they were reconciled, thought the daughter and Mr. Dunn had encouraged divorce proceedings too strongly, and then again she might have said some

rather severe things about the husband while he was away, and to meet Mr. Dunn again with her husband, or otherwise, knowing she had returned to him, would embarrass her, and then again, as the daughter knew Mr. Dunn so well, Mrs. Carson might have been fearful that the daughter would find out too much about her business in the future, assuming she was angry with her. No attention was paid to a like situation in the *Estate of Purcell*, 164 Cal. 300 [128 Pac. 932], and in that case a different attorney had drawn a previous will.

After a careful consideration of the record we feel constrained to say, in the language of the supreme court in the *Estate of Langford*, 108 Cal., at page 621 [41 Pac. 701, 705], referring to the McDevitt case: "In that case the verdict was against the validity of the will, and the judgment and order denying a new trial were reversed; and it would be inconsistent with the decision of this court in that case to affirm the judgment in the case at bar. Numerous authorities upon the subject may be found in the notes to *In re Hess*, 31 Am. St. Rep. 665."

Since the McDevitt case was decided so many cases have been decided in this state setting aside verdicts of juries which have condemned wills on the ground of undue influence that to properly note and analyze all of them would fill a volume, but if we have read them correctly they seem to evince a firm, unvarying course to adhere to the principles laid down in the McDevitt case. The instant case is largely a case of "general influence not brought to bear directly upon the testamentary act," and a case also supported by declarations of the testatrix introduced to show "state of mind." We may appropriately say with the court upon the question of general influence, in the early case of *Woodward* v. *James, supra,* cited in many jurisdictions and by our supreme court in *In re Kaufman,* 117 Cal. 295 [59 Am. St. Rep. 179, 49 Pac. 192] : "These unanimous decisions of our own courts, one would think, ought to put an end to applications to set aside last wills and testaments, on account of the mere general influence of legatees; without which any legacy is seldom given at all. Or on account of a supposed perverseness, in the distribution of his property, by the testator. Or on account of his supposed unnatural dislike to his near relations, and the like. The more especially, when

we find that foreign jurists and judges have very uniformly laid down the same rules," etc.

[2] Undue influence may be established by circumstantial evidence, but " 'it must, however, do more than raise a suspicion. It must amount to proof, and such evidence has the force of proof only when circumstances are proven which are inconsistent with the claim that the will was the spontaneous act of the alleged testator. I think there is nothing beyond suspicion shown here.' " (*Estate of Anderson*, 185 Cal., at p. 709 [198 Pac. 407, 411], quoting from *Estate of McDevitt*.) "There is no proof. Circumstances have been proven which accord with the theory of undue influence, *none of which are inconsistent with the hypothesis that the will was the free act of an intelligent mind.* This does not amount to proof, and many circumstances are shown which are wholly inconsistent with the hypothesis of undue influence, and the presumption of law, in the absence of all proof in a contest, is in favor of the will." (Italics ours.) (*In re Calkins*, 112 Cal. 304 [44 Pac. 577], quoting from the *Estate of McDevitt*.) We also quote the following from notes in *In re Hess*, at pages 687 and 688: "To invalidate a will on the ground of undue influence, there must be affirmative evidence of the facts from which such influence is to be inferred. It is not sufficient to show that the party benefited by the will had the motive or the opportunity to exert such influence; there must be evidence that he did exert it, and so control the actions of the testator, either by importunities which he could not resist, or by deception, fraud, or other improper means, that the instrument is not really the will of the testator. . . . The burden of proof being on those who attack a will on the ground of undue influence, it is not sufficient that they barely show that the circumstances of the will are consistent with the hypothesis of undue influence; for this would be but to create an equipoise in the testimony, and the *onus* being on the party attacking the will, he must go a step further, and show by any suitable evidence the inconsistency between circumstances of the execution of the will, and its being executed without the interposition of undue influence." (Citing many cases.)

The undue influence that must be proven to set aside a will, formally and solemnly executed, is clearly defined in the case of *In re Kaufman, supra.*

[3] " 'Undue influence, however used, must, in order to avoid a will, destroy the free agency of the testator at the time and in the very act of the making of the testament. It must bear directly upon the testamentary act. . . . The fact, then, that a testator with such qualifications makes a foolish, unnatural, or unjust will, does not show that undue influence caused the will' " (*Estate of Donovan, supra,* at p. 394 [73 Pac. 1082], citing many cases.)

From the evidence it would appear that Mrs. Carson was an unusually well-preserved woman for her age. She appeared to have no organic disease whatever. This is a rare condition for one of her age. No expert testimony was offered to prove that she was weak in any respect, only a few acquaintances questioned her soundness and they, it seemed, had ceased to be friends after Mrs. Carson married, and their opinions could not be stronger than the facts upon which they were based: [4] "The opinion of a witness that a person is of unsound mind can be no stronger than or of superior evidentiary weight to the reasons upon which he bases his opinion." (*Estate of Campbell,* 46 Cal. App., p. 621 [189 Pac. 812, 815], and see *Waddington* v. *Busby,* 45 N. J. Eq. 173 [14 Am. St. Rep. 706, 16 Atl. 690].) One of the witnesses in the instant case said: "I do not know whether the woman was insane, I would say at times she was not real sound mind. She acted queer at times." Another testified: "Well, not exactly sound," and a third said the decedent "was of unsound mind off and on for years." Against this testimony many witnesses testified that Mrs. Carson, while perhaps an uneducated woman who had worked hard all her life, was quite a bright old lady, "a lovely old lady," as one of the witnesses said. The evidence was practically all this way. Besides, the doctor who was present when the will was executed declared her fully competent to execute the will. We think we may say the doctor was one of Sacramento's prominent and well-known physicians. His character and standing as a man and as a physician were not questioned at the trial. When Dr. Lindsay was sworn the following occurred: "Mr. Chester: Doctor Lindsay's qualifications will be admitted, I take it. Mr.

Zagoren: As to what, as a doctor or a witness? The Court: In every respect. Mr. Zagoren: We admit both qualifications." We enlarge upon this because we must discuss later the question whether the jury had any right to refuse to follow the effect of his testimony as to the soundness of mind of testatrix at the very time of the execution of the will. No evidence was introduced to show the testatrix had ever lost anything by the mismanagement of her business affairs or otherwise. She must have managed well, else, no doubt, it would have been proven otherwise. She dealt with lawyers and doctors and real estate men, bankers and many other business men. She was very particular, for instance, that she did not lose the interest when the transfer of her money was made from the D. O. Mills bank to another. Not one of these business men testified that she was not competent to transact her business, or that they observed any weakness in any respect in regard to her. The evidence also shows that up to the time she was taken down in her last illness she had her bedroom upstairs and walked up and down stairs daily, and up to the last did much of her cooking and housework. Of course, she may have had some of the usual nervousness due to old age. From all of this evidence, together with the strong testimony given by the subscribing witnesses and the nurse, it would appear that, "the case bears no analogy to that of a testator who contributes nothing to his will but a series of nods and a cross or a signature traced by a guiding hand stronger than his own." It seems that a great many of the wills coming before the courts are not made until the hand of death is almost laid upon the maker, usually after the doctor gives the last warning, and this is usually withheld as long as there is hope, as the worry caused by the knowledge of the approach of death might have a depressing effect upon the patient. The courts must then take the conditions as they find them, and as the law permits wills to be made at such times and as the conditions usually make it the last chance, a duty devolves upon the courts to give effect to every safeguard the law has provided to protect the will, if it appears to be the true will, and to see that it stands, though necessarily sometimes made in some degree of weakness. " 'To set aside a will is a serious matter—and a verdict having that effect should be closely scrutinized by the trial judge. The

upsetting of wills is a growing evil.' " Quoted with approval in *Estate of Morey*, 147 Cal. 505 [82 Pac. 57].
[5] The cases reveal varying degrees of strength of mind in the compass of a few days and if the will is executed on the day when the mind is strong enough to resist the undue influence, if any there be, the will must be sustained. (*Estate of Relph*, 192 Cal. 451 [221 Pac. 361].)

The following are some of the cases in which it was alleged undue influence was exerted upon a weak mind caused by old age or sickness or both and the reviewing court held the evidence of undue influence was insufficient: *Estate of Higgins*, 156 Cal. 257 [104 Pac. 6]; *Estate of Morey*, 147 Cal. 495 [82 Pac. 57]; *Estate of Calef*, 139 Cal. 673 [73 Pac. 539]; *Estate of Lavinburg*, 161 Cal. 536 [119 Pac. 915]; *Estate of Gleason*, 164 Cal. 756 [130 Pac. 872]; *Estate of Purcell*, 164 Cal. 300 [128 Pac. 932]; *Estate of Relph, supra; Estate of Holloway*, 195 Cal. 711 [235 Pac. 1012]; *Estate of Bryson*, 191 Cal. 521 [217 Pac. 525]; *Estate of Hanlon*, 65 Cal. App. 592 [224 Pac. 772]; *Estate of Rickey*, 64 Cal. App. 733 [222 Pac. 628]; *Estate of Perkins* 195 Cal. 699 [235 Pac. 45]; *Estate of Clark*, 170 Cal. 418 [149 Pac. 828]; *In re Kaufman*, 117 Cal. 288 [59 Am. St. Rep. 179, 49 Pac. 192].

The following cases show activity in preparing the will by the beneficiary or close relative or agent: A comparison of the conduct of Mr. Carson with the conduct exhibited in the following cases where the will was upheld, will be useful: *Estate of Morcel*, 162 Cal. 188 [121 Pac. 733]; *Estate of Morey, supra; Estate of Calef, supra; Estate of Higgins, supra; Estate of Lavinburg, supra; Estate of Holloway, supra; Estate of Purcell, supra; Estate of Anderson, supra; Estate of Rickey, supra; In re Ricks' Estate*, 160 Cal. 467 [117 Pac. 539]; *Estate of Relph, supra; Estate of Clark, supra; Estate of Latour*, 140 Cal. 414 [73 Pac. 1070, 74 Pac. 441]. We cite one outside case for the reason that it is so frequently cited by our courts: *In re Hess, supra*.

In many of the foregoing cases the person charged with the undue influence actually remained in the room while the will was being made, and in the Lavinburg case, the one charged with the undue influence actually boasted of her general influence over the testator. In the same case the court, at page 543 of the decision, stating a reason why a

certain daughter was probably not properly remembered in the will, say: "And in this connection it is well to remember that the testator was not upon good terms with Mrs. Werthman when the will was made." And in a similar quarrel between a mother and a daughter wherein the mother practically disinherited the daughter, the supreme court in the case of *In re Kaufman, supra,* say: "Lizzie never afterward saw or communicated with her mother. . . . The greater part of the record is taken up with the circumstances of this quarrel between Lizzie and her mother, apparently either for the purpose of showing to the jury that the mother had no sufficient reason therein for disinheriting her daughter, or in order to allow the jury to conjecture that the mother's dislike of Lizzie may have been fostered by her other sisters. Whatever may have been the reason for its introduction, it was immaterial and irrelevant to either of the issues submitted to the jury." The following are some of the cases of undue influence in which powers of attorney and other authority were given, but in which it was held that this in itself does not create a presumption of undue influence. This condition will be found in the following cases, wherein the will was upheld by the reviewing court: *Estate of Lavinburg, supra; Estate of Morcel, supra; Estate of Purcell, supra; Estate of Rickey, supra; Estate of Bryson, supra; Estate of Hanlon, supra.* The following are some of the cases in which undue influence was denied to be sufficient where the second wife or husband was charged with undue influence and where jealousy and bad feeling resulted in quarrels, etc.: *Estate of Morcel, supra; Estate of Rickey, supra; Estate of Langford, supra; Estate of Donovan, supra.*

The instances will be found rare where our supreme court has permitted a will to be upset solely upon the ground of undue influence where the charges have been made against the husband or wife. [6] No presumption is permitted to be indulged against this relation in this state, and it is not permitted in most other jurisdictions. Our supreme court, in the *Estate of Donovan, supra,* at page 395, very clearly adopted this view: "There is no legal presumption against the validity of any provision which a husband may make in the wife's favor, for she may justly influence the making of her husband's will for her own benefit or that of others so long as she does not act fraudulently, or

74 Cal. App.—5

extort benefits from her husband when he is not in con-
dition to exercise his faculties as a free agent." The
Langford case, *supra*, is full of expressions of like pur-
port and has been approved in later cases. Mr. Freeman,
in his notes in *In re Hess, supra*, at page 679, places this
right above that of the child: "While the right of children
may not stand on the same high footing as that of a wife
to be heard respecting a will, still there is no doubt that
they have the right to influence their parent by fair argu-
ment, or even by entreaty, to make disposition of his prop-
erty in their favor: . . . so long as no fraud is practiced
upon the testator, and no advantage taken of his weakness
and his inability to resist, his bounty may be sought by every
appeal to his intelligence or his emotions which may law-
fully influence his judgment or his affections. He may be
flattered, persuaded, or entreated . . . the importunity may
be such as no delicate mind could be guilty of: . . . and yet
if he yield intelligently, and from conviction, the influence
thus operating is not undue: . . . solicitations, however
importunate, cannot of themselves constitute undue in-
fluence, for, though these may have a constraining effect,
they do not destroy the testator's power to freely dispose of
his estate." (Citing many cases.) (See, also, 28 R. C. L.,
sec. 94 and notes.)

Nearly all of the cases wherein the courts have approved
the setting aside of the will on the ground of undue in-
fluence, the circumstances are shown, not by inference, but
by positive proof that the person charged with exerting the
undue influence was active in procuring the execution of the
will, or was guilty of trying to keep relatives away from
the testator, or both, as in the *Estate of Tibbetts*, 137 Cal.
123 [69 Pac. 978]; *Estate of Kendrick*, 130 Cal. 360 [62
Pac. 605]; *Estate of Snowball*, 157 Cal. 301 [107 Pac. 598];
*Estate of Olson*, 19 Cal. App. 379 [126 Pac. 171]. In
*Estate of Ramey*, 62 Cal. App. 413 [217 Pac. 135], the
evidence of Mrs. Wilcoxson would support a finding that
the person charged with the undue influence was present
when the will was discussed and executed and there is other
evidence that when executed the will was immediately given
by the testatrix into the keeping of the person charged with
the undue influence. In all of these cases the activities in
having the will executed by the person charged are dis-

gustingly prominent and they are not merely suspected, but sufficient circumstances are positively proven upon which the jury could act, and in the Estates of Kendrick and Ramey, a very bad condition of mind and body were proven. In the Tibbetts case, one of the cases respondent urges very strongly upon us for consideration, the supreme court, in its decision, said: "The case is undoubtedly a very close one," and Justice Temple, who wrote the opinion in the McDevitt case, and Justice Harrison, who wrote the opinions in the Kaufman and Calkins cases, dissented from the judgment. In the *Estate of Kendrick,* the court say: "Upon the question of the sufficiency of the evidence to support the verdict that the will was procured by undue influence, we confess a feeling of some doubt. The question is a close one." In *Estate of Ramey,* the court, referring to the question of undue influence, which it had just been considering, said: "The other question seems less difficult of solution." (Meaning the question of unsoundness of mind.) In *Estate of Olson,* the evidence seemed to have been so strong in proof of the undue influence that the appellant did not take the evidence before the reviewing court, but relied upon an effort to attack the pleadings. In that case the design of the person charged with the undue influence was proven by his own statements and it was clearly proven that he went with the testatrix and was present during the preparation of the will and immediately left with her after its preparation. This point was commented upon by the court, citing *Estate of Snowball, supra,* and saying, at page 388: "A similar circumstance was given significance where the favored daughter of the testatrix went to the office of the lawyer with the testatrix who then made the will 'while the daughter remained in another room.'" The charges in the Olson case are particularly revolting and seem to have been fully proven.

The judgment should be reversed and it is so ordered.

Finch, P. J., and Plummer, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on August 27, 1925 and a peti-

tion by respondent to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on September 24, 1925.